**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RP WYNSTONE, LP; REAL PRO ENTERPRISES, LP; AND PROVIDENT TRUST GROUP, LLC | : CIVIL ACTION |
| Plaintiffs, | : No. _____ |
| v. | : JURY TRIAL REQUESTED |
| NEW HANOVER TOWNSHIP; NEW HANOVER TOWNSHIP AUTHORITY; BOARD OF SUPERVISORS OF NEW HANOVER TOWNSHIP, JAMIE GWYNN, WILLIAM ROSS SNOOK, KURT ZEBROWSKI, MARIE LIVELSBERGER, BOONE FLINT, THOMAS MISKIEWICZ, CHARLES GARNER, RUSSEL OISTER, SUSAN SMITH, WILLIAM MOYER; KNIGHT ENGINEERING INC.; DANIEL GRAY, CEDARVILLE ENGINEERING GROUP, LLC, and ROBERT FLINCHBAUGH | : |
| Defendants. | |

## COMPLAINT

Plaintiffs, RP Wynstone, LP, AT Realty, LP, AKM Properties, LP, Trollyline Enterprises, LP, General Hancock Partnership Enterprises, LP, Real Pro Enterprises, LP, Provident Trust Group, LLC FBO Benjamin Goldthorp Roth IRA, and Provident Trust Group, LLC FBO Clayton Heckler IRA, by and through their attorneys, Kang Haggerty, LLC files this complaint against the above-named defendants and avers as follows:

## NATURE OF ACTION

1.      RP Wynstone, LP ("RP Wynstone"), AT Realty, LP ("AT Realty"), AKM Properties, LP ("AKM Properties"), Trollyline Enterprises, LP ("Trollyline"), General Hancock

Partnership Enterprises, LP ("General Hancock"), Real Pro Enterprises, LP ("RPE"), and Provident Trust Group, LLC ("Provident") FBO Benjamin Goldthorp Roth IRA ("Goldthorp IRA") and FBO Clayton Heckler IRA ("Heckler IRA") (collectively referred to herein as the "Landowners" or "Plaintiffs") are legal or equitable owners of various real estate located in New Hanover Township ("Township") totaling more than 230 acres.

2.      At all relevant times, the Landowners have proposed to subdivide and develop their properties.

3.      This is a case about a township taking extreme measures and displaying egregious conduct to prevent development in the community by any means necessary, including bad-faith consideration of development.

4.      Through a years-long campaign of hindrance and delay, Defendants have disrupted development and violated the Landowners' property rights by reviewing development applications in bad-faith, passing restrictive ordinances designed to make development commercially unfeasible, and even outright ignoring a presiding judge's directive to hold off on deciding on the application pending litigation.

5.      These extreme measures are motivated by unconscionable and unconstitutional income discrimination and racial bias, designed to stop the construction of new affordable housing that in turn increases housing density and attracts new residents to the Township, and to prevent any increase in the population of racial minorities in New Hanover Township, which is currently 95% white.

6.      The Township's recent history is marred by scandals, in which prominent Township officials openly used racial slurs without repercussion.

7.      One such individual was ultimately appointed to the Township Planning Commission, giving him significant control over the future demographics of the Township.

8.      In carrying out their conspiracy, Defendants acting under the color of state law, deprived Plaintiffs of their constitutional rights, causing significant damages.

9.      Defendants, acting together, sought to enforce their personal preferences as though they had the force of law, imposing requirements on Plaintiffs with no basis in law or fact and singling Plaintiffs out for unfair treatment and unequal enforcement of the Township's policies.

## JURISDICTION AND VENUE

10.      This Court has original jurisdiction over Plaintiffs' constitutional claims and federal law claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

11.      The venue for this action properly lies in this District pursuant to 28 U.S.C. § 1391 because the defendants reside in this District and the events giving rise to these claims occurred in Montgomery County, Pennsylvania, which is within this District.

## PARTIES

12.      Plaintiff RP Wynstone is a Pennsylvania limited partnership with an address of 2312 North Broad Street, Colmar, Pennsylvania.

13.      Plaintiff AT Realty is a Pennsylvania limited partnership with an address of 2312 North Broad Street, Colmar, Pennsylvania.

14.      Plaintiff AKM Properties is a Pennsylvania limited partnership with an address of 2312 North Broad Street, Colmar, Pennsylvania.

15.      Plaintiff Trollyline is a Pennsylvania limited partnership with an address of 2312 North Broad Street, Colmar, Pennsylvania.

16.      Plaintiff General Hancock is a Pennsylvania limited partnership with an address of 2312 North Broad Street, Colmar, Pennsylvania.

17.     Plaintiff RPE is a Pennsylvania limited partnership with an address of 2312 North Broad Street, Colmar, Pennsylvania.

18.     Plaintiff Provident is a Nevada limited liability company with an address of 2312 North Broad Street, Colmar, Pennsylvania.

19.     Defendant Township is a Pennsylvania municipality, a township of the second class, organized under the laws of the Commonwealth of Pennsylvania with an office located at 2943 North Charlotte Street, Gilbertsville, Pennsylvania and is capable of suing and being sued.

20.     Defendant New Hanover Township Authority, a/k/a New Hanover Township Sewer Authority ("Sewer Authority"), is a municipal authority established in accordance with the Municipality Authorities Act, 53 Pa. C.S.A. § 5601, *et seq.*, with an address at 2990 Fagleysville Road, Gilbertsville, Pennsylvania.

21.     Defendant Board of Supervisors of New Hanover Township (the "Board") is the governing body of the Township with a mailing address of 2943 North Charlotte Street, Gilbertsville, Pennsylvania. At all times relevant hereto, the Board was comprised of five Supervisors, each of whom served during some time period relevant hereto.

22.     Defendant Jamie Gwynn is the Township Manager ("Manager Gwynn") since December 2016.

23.     Defendant William Ross Snook is a Board Supervisor ("Supervisor Snook") since 2018.

24.     Defendant Kurt Zebrowki is a Board Supervisor ("Supervisor Zebrowski") since 2018.

25.     Defendant Marie Livelsberger is a Board Supervisor ("Supervisor Livelsberger") since 2018.

26.     Defendant Boone Flint is a Board Supervisor ("Supervisor Flint") since 2020.

27.     Defendant Thomas Miskiewicz is Chair of the Sewer Authority ("Authority Chair Miskiewicz") since approximately 1993.

28.     Defendant Charles Garner was a Board Supervisor ("Supervisor Garner") from 2016 to 2021.

29.     Defendant Russel Oister ("Planning Chair Oister") is Chair of the Township Planning Commission since 2021

30.     Defendant Susan Smith ("Planning Vice Chair Smith") is Vice Chair of the Township Planning Commission since approximately 2004 and a past Chairperson.

31.     Defendant William Moyer ("Planning Member Moyer") is a member of the Township Planning Commission since 2022.

32.     Knight Engineering Inc. ("Knight") is the engineering firm currently retained by Defendant Township as its municipal engineer.

33.     Daniel Gray "(Gray")" is an individual engineer employed by Knight to act as the Defendant Township's municipal engineer.

34.     Cedarville Engineering Group, LLC ("Cedarville") is the former engineering firm retained by Defendant Township as its municipal engineer.

35.     Robert Flinchbaugh ("Flinchbaugh") is an individual engineer employed by Cedarville, to act as the Defendant Township's municipal engineer.

36.     Manager Gwynn, Supervisor Snook, Supervisor Zebrowski, Supervisor Livelsberger, Supervisor Flint, Authority Chair Miskiewicz, Supervisor Garner, Planning Chair Oister, Planning Vice Chair Smith, and Planning Member Moyer, Gray, and Flinchbaugh are collectively referred to herein as the "Individual Defendants."

**FACTS**

37.     The Landowners are legal or equitable owners of various real property in the Township and seek to develop their properties through medium and/or high density residential and commercial developments.

38.     The Township is governed by a five-person Board of Supervisors who are elected at large and serve six-year terms.

39.     With changes in the elected Township officials and with the recent influx of new residents, the Township has engaged in a concerted effort to reduce or stifle housing density in new residential developments by hindering and denying subdivision and land development applications for the purpose, *inter alia*, of limiting affordable housing and maintaining the predominantly white racial makeup of the Township.

40.     As set forth below, the Township has a recent troubled history with race, resulting in scandalous news stories, internal investigations, and a review by the Pennsylvania Attorney General.

41.     Police Sergeant William Moyer, who is also the Township fire chief, stood at the center of that scandal.

42.     By 2019, it was reported that Sgt. Moyer, one of the most senior officers in the Township, repeatedly used racial slurs while on the job to disparage non-white residents and others.

43.     Stories reported that Sgt. Moyer repeatedly used the "n-word," while out in public or in his police uniform, and there was even a "burn book" at the Police Department referred to by the officers as the "Book of Billisms" that recorded many of the inappropriate and racial slurs used by Sgt. Moyer.

6

44.     In one incident, Sgt. Moyer described an incident after executing a warrant in a lower-income part of the Township.

45.     Sgt. Moyer referred to black suspects involved as "porch monkeys."

46.     Then Township police chief Kevin McKeon also reportedly used the n-word to describe the backs of the clutch pins that hold officers' collar brass in place, because "they always hang around but never work."

47.     It was similarly reported that Sgt. Moyer and others would abuse their authority to silence any potential critics within the Township, including by drumming up pretextual grounds to discipline officers who did not accept his behavior.

48.     Even the police force's own was not immune to the racist statements.

49.     A police officer, who was married to an Asian-American, reported hearing racist statements over the years from people on the job about his Asian-American wife and children.

50.     Following early retirement due to a work-related injury, the police officer went to the Township police station to pick up his belonging, which had been placed in three boxes and piled up outside the station.

51.     Sitting atop the stack of boxes, was an egg roll.

52.     The "egg roll" incident was not an isolated work of a singular person, as one of the boxes was too heavy for one person to carry, but indicative of a culture fostered and nurtured by Sgt. Moyer and the Township police chief.

53.     Sgt. Moyer called the police officer's physician, who was of Asian descent, a "witch doctor."

54.     Residents of the Township reportedly had issues with the Township police and were "afraid to call the police when they needed [the police]."

55.     Faced with public allegations of discrimination and harassment, Manager Gwynn asked the news source to share information with him, but at the same time minimized the gravity of the allegations, stating that "should I not hear from you, I shall assume that you have no factual support for these allegations."

56.     Even after specific accusations were shared with Manager Gwynn, Manager Gwynn protected the Township's own, stating that to his knowledge, the information "was never the subject of a complaint made to the Township" and that "[i]n the event the Township is presented with any allegations of wrongdoing as referenced in the article, then the Township will take appropriate action pursuant to Township policy and practice."

57.     The Township never released the results of its internal investigation into the racist comments and Sgt. Moyer retired from the police department without adverse action.

58.     Instead of cleaning up its act, the Township rewarded one of the individuals involved, Sgt. Moyer, by appointing him to the Township's Planning Commission.

59.     The Township Planning Commission plays a critical advisory role in the land development process, as it is the primary body which reviews pending applications and makes recommendations for their approval or denial.

60.     Notably, on January 3, 2022, after Sgt. Moyer retired from the police force, Supervisor Snook moved to appoint former Sgt. Moyer to the Planning Commission, where Sgt. Moyer could continue to exert his influence with authority.

61.     In appointing Sgt. Moyer to the Planning Commission, the Township effectively endorsed his racist comments.

3597131.1

62.     Sgt. Moyer, and other Board Supervisors or Planning Commission members, repeatedly made coded statements (also known as "dog whistles") to signal the desire to keep the minority population in the Township from growing.

63.     For instance, Sgt. Moyer and others expressed their opinion that apartments or other forms of multi-unit housing, which would likely increase the racial diversity of the Township, was not appropriate for the town.

64.     In one unguarded moment, Sgt. Moyer even expressed that the more affordable housing options would attract "those kinds of people" to the Township.

65.     Other publications similarly capture the Township's preoccupation with preventing diversity by restricting new housing.

66.     The Township encompasses 13,880 acres, and as of 2018, had a population of 13,035.

67.     Population projections developed by the Delaware Valley Regional Planning Commission projected the Township to have the highest levels of population growth, both in terms of percent change as well as absolute change, in the municipalities in the Pottstown Metropolitan Region, which includes the Township.

68.     The Township had agreed in the Pottstown Metropolitan Region Intergovernmental Cooperative Implementation Agreement for Regional Planning to provide a minimum of 750 acres for fair share of various dwelling types encompassing all basic forms of housing.

69.     Much of the area in the Township designated for primary growth is comprised of the Landowners' properties.

70.     Duplicitous in its interaction with the other regional townships, the Township notes in its Comprehensive Plan 2040 that "[p]opulation growth is intricately linked with new housing

development," and that the Township was "anticipated to attract twice as many new residents as neighboring Douglass Township and over twice as many new residents than any other municipality in the Pottstown Metropolitan Region."

71.     The Township seeks to place "higher density and multifamily housing to be located in areas where it is more practical, such as Pottstown, to enable more rural townships like New Hanover to maintain their community character and limit development pressures in rural resource conservation areas."

72.     The "community character" of the Township is 95% white.

73.     By contrast, Pottstown, the "more practical" place for additional population growth, is about 63% percent white.

74.     The "community character" of the Township is comprised primarily of single-family detached dwelling units, accounting for 27.04% of total land area.

75.     On the other hand, multifamily homes in the Township account for only 0.05% of total land area.

76.     The Township's plan is to "[d]ecrease permitted housing density in new residential developments within the areas identified as medium to low density residential in the future land use map" and to "[a]mend the performance standards for higher density housing land uses in the township's zoning ordinance to better align future development with limitations in the availability for compatibility with soil typology, hydrology, and traffic impacts."

77.     While the Township could utilize several tools to prevent new developments, by passing restrictive ordinances and subjecting new development plans to a more critical review in order to control housing density and to protect the community character of the Township, the

problem, however, lies with previously approved development plans, as they remain immune to and protected against changes in ordinances that can adversely affect the plans.

78.    Supervisor Snook described previously approved development plans as being "the most critical issue facing" the Township, noting that the prior plans "were approved by prior boards giving them vested rights."

79.    One such previously approved development was the preliminarily approved development plan for the RP Wynstone Properties (defined below) that included apartments over ground-floor commercial space.

80.    Although the Township had previously approved the building of apartments, the Township objected to an updated plan including a 100-unit apartment building, with Supervisor Zebrowski specifically noting: "I don't see apartments fitting in the township."

81.    Thus, in order to subject previously approved development plans to more stringent requirements enacted in recent years (or kill the project entirely), the Township had to first deprive the Landowners of protections from changes in ordinances afforded by the Pennsylvania Municipalities Planning Code.

82.    Through inconsistent application of existing ordinances impacting land development and unlawful enactment of unreasonable ordinances, Defendants have obstructed and interfered with the Landowners' development of their properties.

83.    In order to address the Township's inconsistent, unreasonable, and improper treatment of the Landowners, the Landowners have had to initiate numerous legal actions against the Township to seek court intervention and redress.

84.    Rather than work with the Landowners in good faith to address appropriate subdivision and land development, Defendants have sought to use the numerous legal actions that

11

the Landowners have had to file to pressure the Landowners into reducing the proposed housing density by 50%, which requires the Landowners to completely redesign the proposed land development and significantly reduces the profits of the proposed developments.

85.     Consistent with their apparent objective of restricting growth and increased diversity, the Township has effectively stopped all building and land development.

86.     In the last several years, while the Township has approved minor subdivisions, the Township has not approved any major subdivision and land development plans.

87.     In 2022, the only approved land development was for a storage tank for a public utility.

88.     Not surprisingly, with no major subdivision and land development plans approved in the last several years, the number of new home residential building permits issued by the Township has dropped precipitously from 131 (in 2021) to **10** (in 2022) to **0** (as of mid-December 2023).

89.     Because the Landowners propose major subdivision and land developments that will increase housing density within the Township, and thus impact the minority makeup of the Township, Defendants have treated the Landowners differently from other property owners in the Township.

A.     **RP Wynstone Property**

90.     RP Wynstone and its related business entities, AT Realty, AKM Properties, Trollyline, and General Hancock are the legal or equitable owners of eleven (11) parcels of land located within the Township ("RP Wynstone Property"). *See* Deeds for RP Wynstone Property collectively attached hereto as **Exhibit A**.

91.     The RP Wynstone Property is approximately 200 acres in size and was split-zoned among the Township TC Town Center zoning district (the "TC District"), the TN Traditional

12

Neighborhood zoning district (the "TN District"), and the R-25 Residential zoning district (the "R-25 District") from 2004 until December 2, 2021, when the Township rezoned the property to Village Mixed Use.

92.     RP Wynstone proposes to develop the RP Wynstone Property with a mixed-used development called "New Hanover Town Center" comprising residential dwelling units of various types including single-family detached dwellings, village houses, twins, atrium houses, townhouses, and mixed-use multi-family office buildings; flex retail buildings; restaurants; a clubhouse; and a supermarket, along with associated parking, roadways, landscaping, lighting and stormwater management facilities (the "RP Wynstone Development").

93.     As a significant development that would increase affordable housing inventory and accordingly promote racial diversity, Defendants undertook a concerted plan to stop the RP Wynstone Development, by imposing burdensome requirements, rescinding prior approvals, taking steps to make it economically unfeasible, and otherwise halt its progress.

94.     With each roadblock imposed by the Township, RP Wynstone incurs significant additional professional costs, expenses, and delays. The following history of the approval process for the RP Wynstone Development illustrates the length of time that this project has languished.

       1.     <u>2007 Preliminary Approval</u>

95.     The initial subdivision and land development phasing plans for the RP Wynstone Development were submitted to the Township by a predecessor-in-title on July 13, 2005.

96.     The Township granted preliminary land development approval on October 22, 2007, by Resolution No. 58-07 (the "2007 Preliminary Approval"). *See* Resolution No. 58-07, attached hereto as **Exhibit B**.

97.     The 2007 Preliminary Approval was governed by the Township's Subdivision and Land Development Ordinance ("SALDO") in effect at the time of the Applicant's original plan

submission on July 13, 2015 (the "2005 Ordinances") as well as three (3) additional ordinances subsequently enacted by the Township:   Ordinance No. 05-06[1], adopted August 22, 2005 ("Ordinance 05-06"); Ordinance No. 06-02, adopted January 30, 2006 ("Ordinance 06-02"); and Ordinance No. 07-08, adopted October 8, 2007 ("Ordinance 07-08") (collectively, the "Additional Ordinances."). *Id.* at 5.

98.    Ordinance 06-02, among other things, added a new subsection to the Zoning Ordinance, §27-808A Reduction in Open Space, that allows for a 5% reduction in open space for a fee in lieu of open space. *See* Ordinance 06-02, attached hereto as **Exhibit C**.

99.    Ordinance 07-08, among other things, added a new subsection to the Zoning Ordinance, §27-801A.4 Unified Development of a Tract within the TC and TN Zoning Districts, which permits density to be combined and transferred to other zoning districts throughout the tract. *See* Ordinance 07-08, attached hereto as **Exhibit D**.

100.    The Township required compliance with the Additional Ordinances as a condition of approval.

101.    These Additional Ordinances would later prove critical. Though the Township consistently applied the Additional Ordinances in reviewing the plans for many years, it later reversed its position, without legal basis, and claimed that the Additional Ordinances did not apply.

102.    Using the confusion and contradictions that this inconsistency created, the Township later used this self-generated dispute over the applicable ordinances to deny the RP Wynstone Development.

---

[1] Resolution No. 58-07 transposed the applicable Ordinance numbers and erroneously identified Ordinance 06-05 and not Ordinance 05-06.

3597131.1

103.    The 2007 Preliminary Approval also granted 19 waiver requests from the Townships' SALDO requirements. *See* Resolution No. 58-07, Ex. B, at 16

104.    The preliminarily approved plan[2] ("Approved Preliminary Plan") proposed to develop the site as a mixed-use development consisting of approximately 379,220 square feet of commercial/office space and 761 residential units (141 units as detached dwelling; 303 units as atrium house; 139 units as townhouses; and 178 units as multiplex dwellings).

105.    Under Pennsylvania Municipalities Planning Code ("MPC") §508(4), applications are protected from changes in ordinances that adversely impact the application.

106.    Specifically, MPC §508(4) provides, in relevant part,

(4)  Changes in the ordinance shall affect plats as follows:

(i)  From the time an application for approval of a plat, whether preliminary or final, is duly filed as provided in the subdivision and land development ordinance, and while such application is pending approval or disapproval, no change or amendment of the zoning, subdivision or other governing ordinance or plan shall affect the decision on such application adversely to the applicant and the applicant shall be entitled to a decision in accordance with the provisions of the governing ordinances or plans as they stood at the time the application was duly filed. **In addition, when a preliminary application has been duly approved, the applicant shall be entitled to final approval in accordance with the terms of the approved preliminary application as hereinafter provided.** However, if an application is properly and finally denied, any subsequent application shall be subject to the intervening change in governing regulations.

(ii)  When an application for approval of a plat, whether preliminary or final, has been approved without conditions or approved by the applicant's acceptance of conditions, **no subsequent change or amendment in the zoning, subdivision or other governing ordinance or plan shall be applied to affect adversely the right of the applicant to commence and to complete any aspect of the approved development in accordance with the terms of such**

---

[2] The Approved Preliminary Plan involved a group of properties substantially similar, but not completely identical, to the RP Wynstone Property that was part of Revision No. 8 and the 2022 New Application.

**approval within five years from such approval.** The five-year period shall be extended for the duration of any litigation, including appeals, which prevent the commencement or completion of the development and for the duration of any sewer or utility moratorium or prohibition which was imposed subsequent to the filing of an application for preliminary approval of a plat. In the event of an appeal filed by any party from the approval or disapproval of a plat, the five-year period shall be extended by the total time from the date the appeal was filed until a final order in such matter has been entered and all appeals have been concluded and any period for filing appeals or requests for reconsideration have expired, provided, however, no extension shall be based upon any water or sewer moratorium which was in effect as of the date of the filing of a preliminary application. ((ii) amended June 22, 2000, P.L.495, No.68)

MPC §508(4) (emphasis added).

107.    Thus, the Approved Preliminary Plan was protected from subsequent changes or amendments in zoning, subdivision or other governing ordinance that adversely affects the right to develop in accordance with the terms of the 2007 Preliminary Approval, which expressly applied the 2005 Ordinances as modified by the Additional Ordinances.

108.    Notably, the Approved Preliminary Plan was one such previously approved development plan that was "approved by prior boards giving [the landowners] vested rights" that Supervisor Snook has since described as being "the most critical issue facing" the Township, as it was not subject to a more critical review in order to control housing density and to protect the 95% white community character of the Township.

109.    In other words, in order to deprive RP Wynstone of the protections afforded by MPC §508(4) and to use subsequently enacted restrictive zoning changes or other ordinances to stop the RP Wynstone Development, Defendants would first need some pretext to deny the pending application.

2.    Revised Plan Submissions (Revision Nos. 1-7) and Reviews

110.    RP Wynstone acquired its interest in the properties at issue in the Approved Preliminary Plan in and around 2011 and 2012, following the bankruptcy of the predecessor developer.

111.    In 2012, RP Wynstone approached the Township about pursuing the development of the Approved Preliminary Plan.

112.    During an October 14, 2013 Township Board of Supervisors meeting, the Supervisors "commented that a development of this type would provide conveniences to Township residents" and that the development was "a critical project for the Township," and the Township agreed to a meeting to discuss the potential development. *See* Township Board of Supervisors Regular Meeting Minutes, October 14, 2013, attached hereto as **Exhibit E**.

113.    Subsequently, RP Wynstone engaged a planning and design consultant, recommended by the Township, to prepare a conceptual sketch plan, which was submitted to the Township.

114.    Thereafter, a series of meetings were held among RP Wynstone and its professional consultants and the Township staff, officials, and professional consultants, during which the conceptual sketch plan was reviewed and further refined.

115.    Prior to proceeding with preparing and submitting a fully engineered revised preliminary plan set, RP Wynstone submitted a letter to the Township requesting confirmation of the continued viability of the 2007 Preliminary Approval, as well as guidance regarding certain discussions with the Township's professional consultants. *See* December 10, 2015, Letter, attached hereto as **Exhibit F.**

116.     On or about March 9, 2016, the Township solicitor issued a letter confirming that the 2007 Preliminary Approval remained valid until April 22, 2020. *See* March 9, 2016, Letter, attached hereto as **Exhibit G.**

117.     Relying on the validity of the 2007 Preliminary Approval, including the application of the 2005 Ordinances and the Additional Ordinances expressly applied in the 2007 Preliminary Approval, RP Wynstone prepared and submitted seven (7) sets of revised preliminary plans from May 2016 through June 2019 ("Revision Nos. 1-7"), each of which was reviewed by the Township planner, traffic engineer and civil engineer, applying both the 2005 Ordinances as modified by the Additional Ordinances.

118.     In reviewing Revision Nos. 1-7, the Township's professional consultants:

   a.   noted the revised plans' compliance with the density requirement under §27-801A.4 Unified Development and Density of the Ordinance 07-08.

   b.   required the design to comply with §27-805A.3.1 (table note 7) Pedestrian Scale Lighting of the Ordinance 06-02.

   c.   required RP Wynstone to provide calculations to determine the value of the fee in lieu of open space as permitted under §27-808A Reduction in Open Space of the Ordinance 06-02.

   d.   applied §22-836 Design Standards for TC-Town Center District, which was added in the Ordinance 06-02, and concluded that the proposed plan appears to meet the outlined criteria with a few noted exceptions.

   e.   required RP Wynstone to provide a plan that denotes the classification of all roadways to verify compliance with §22-809A Street Standards for the TC-Town Center District and TN-Traditional Neighborhood District of Ordinance 06-02.

f.   acknowledged that "[a]partments above the nonresidential development are included as commercial space rather than residential dwelling units" and that "[t]his should be clearly indicated on the plans."

119.   Even after RP Wynstone submitted Revision No. 4 dated August 4, 2017, which amended the preliminary plan to include two additional parcels (parcel no. 47-00-07244-809 and parcel no. 47-00-03900-004) and the number of dwelling units was increased to 772 units, the Township planner noted the addition of the two parcels and the increase in dwelling units, and again noted that that the "proposed overall combined density is compliant with the maximum permitted combined density" as required under §27-801A.4 Unified Development and Density of Ordinance 07-08.

120.   None of the Township's professional consultants objected to the addition of the two parcels.

121.   Following RP Wynstone's submission of Revision No. 4, very little changed on the plan set that affected planning comments, until RP Wynstone's submission of Revision No. 7 dated November 9, 2018.

122.   Unlike the prior revisions, rather than take advantage of the 5% reduction in required open space by payment of a $2.6 million fee in lieu of open space as provided under §27-808A Reduction in Open Space of Ordinance 06-02, Revision No. 7 reduced the proposed number of dwelling units from 772 units to 692 units, reduced the total tract size from 208.907 acres to 203.072 acres, replaced office and daycare uses in the TN District with open space areas, and added an access drive along North Charlotte Street.

123.   However, as before, the Township planner noted continued compliance with the design standards under §22-836 of Ordinance 06-02 and did not raise any new issue.

124.    After receiving and reviewing Revision Nos. 1-7 as revisions to the Approved Preliminary Plan, applying 2005 Ordinances as well as the Additional Ordinances expressly referenced in the 2007 Preliminary Approval, concerned with the influx of new residents, particularly, the influx of racial minorities in the Township, spurred by new residential construction, the Township began to intentionally suppress land development by enacting arbitrary ordinance amendments and treating RP Wynstone, as a developer of major subdivision and land development, differently from other landowners.

3.    The Township's Coordinated and Concerted Action to Obstruct Development and Curb Racial Diversity

125.    For fear of attracting "those kinds of people" – in other words, minorities – by increasing available housing options, which options were to be provided by the RP Wynstone Development, Defendants engaged in a coordinated and concerted effort to strip RP Wynstone of the protection from changes in ordinances afforded by the 2007 Preliminary Approval in order to obstruct the RP Wynstone Development.

a.    The Township arbitrarily and unreasonably amended the sump pump requirement of the Stormwater Management Ordinance

126.    Laying the groundwork to obstruct RP Wynstone's proposed development plan, the Township arbitrarily and unreasonably amended the sump pump requirement of the Stormwater Management Ordinance ("SWM Ordinance").

127.    Sometime before June 12, 2018, the Township provided to Montgomery County Planning Commission ("MCPC") a draft ordinance to amend, in part, the SWM Ordinance, adding regulations concerning the installation of new sump pump.

> The sump pump or pipe drain discharge shall be directed into onto an absorbent surface such as grass, mulch, rip-rap or soil so that the discharge will be dissipated and not immediately drain to the Township right-of-way or adjacent properties. The discharge location shall be as approved by the Township Engineer or his

designee. In the event that it is not feasible to direct discharge onto an absorbent surface, the discharge may be directed to a storm sewer, swale, ditch, detention basin, drainage basin or other drainage facility or location so long as the applicant proves to the satisfaction of the Township Engineer that the stormwater management facility is designed to accommodate the discharge. For all required computation, the applicant shall use the figure of **4,000 gallons per day per sump pump**, and assume the sump pump will run for one week following a storm event. The permit shall provide for inspections as deemed necessary by the Township Engineer once the sump pump is operational, to determine if the discharge has been adequately addressed.

Draft Ordinance (emphasis added), attached hereto as **Exhibit H**.

128.    After obtaining MCPC's support for the draft ordinance, the Township Planning Commission met on June 13, 2018, to discuss, in part, the draft ordinance. After specifically discussing the proposed standard of 4,000 gallons per day per sump pump, the Township Planning Commission voted to recommend adoption of the draft ordinance by the Board as presented.

129.    Although the Township had presented a version of the draft ordinance to the MCPC that used a standard of 4,000 gallons per day per sump pump and the Township Planning Commission expressly discussed and recommended the same standard of 4,000 gallons per day per sump pump, on July 23, 2018, in order to impose a more stringent requirement on new development, Supervisor Snook moved to adopt a revised version of the ordinance, one that used the standard of 4,000 cubic feet and not 4,000 gallons, characterizing the revisions as a correction of a typographical error.

130.    In a classic bait-and-switch maneuver, the Township presented a 4,000-gallon version for comments, but approved a 4,000 cubic feet version, which is equivalent to 29,922.08 gallons[3] per day per pump.

---

[3] 1 cubic foot is equal to 7.48052 gallons.

131.    Incredulously, Supervisor Snook characterized this maneuver that septupled the requirement from 4,000 gallons to 29,922.08 gallons as a "typographical correction" and the Board simply approved the "typographical correction" without any notice, review, or comment.

132.    On July 23, 2018, the Board voted to adopt the revised ordinance and enacted Ordinance 18-04, which used the drastically increased standard of 4,000 cubic feet per day per pump as follows:

> The sump pump or pipe drain discharge shall be directed into onto an absorbent surface such as grass, mulch, rip-rap or soil so that the discharge will be dissipated and not immediately drain to the Township right-of-way or adjacent properties. The discharge location shall be as approved by the Township Engineer or his designee. In the event that it is not feasible to direct discharge onto an absorbent surface, the discharge may be directed to a storm sewer, swale, ditch, detention basin, drainage basin or other drainage facility or location so long as the applicant proves to the satisfaction of the Township Engineer that the stormwater management facility is designed to accommodate the discharge. For all required computation, the applicant shall use the figure of **4,000 cubic feet per day per sump pump**, and assume the sump pump will run for one week following a storm event. The permit shall provide for inspections as deemed necessary by the Township Engineer once the sump pump is operational, to determine if the discharge has been adequately addressed.

Ordinance 18-04 (emphasis added), attached hereto as **Exhibit** I.

133.    Despite the switch to this excessive standard, on October 4, 2018, the Township adopted Ordinance 18-05, which affirmed and readopted Ordinance 18-04. More importantly, Ordinance 18-05 did not amend or otherwise change the 4,000 cubic feet per day per sump pump requirement. *See* Ordinance 18-05, attached hereto as **Exhibit J.**

134.    The language of Ordinance 18-04 and Ordinance 18-05 regarding the sump pump requirement was codified in SWM Ordinance §23-401.28.A(2)(a) ("Sump Pump Ordinance").

135.    The requirements of the Sump Pump Ordinance are arbitrary on their face, requiring capacity that is commercially and practically unreasonable, with no apparent benefit.

22

136.   Even without the addition of the Sump Pump Ordinance, the SWM Ordinance already requires applicants to design stormwater management system to have sufficient capacity to manage the amount of precipitation that falls during a one-hundred year storm such that only 50% of the pre-development peak rate of runoff leaves the property post-development.

137.   The very same requirements under the SWM Ordinance govern the same quantities and volumes of storm water that will flow into basements to be diverted by sump pumps.

138.   As such, an additional fixed sump pump flow requirement is not necessary when calculating the necessary capacity for stormwater management system.

139.   The Sump Pump Ordinance also discriminately impacts larger subdivision and land developments.

140.   The Sump Pump Ordinance arbitrarily prohibits basements adversely impacting the marketability of the homes that Landowners intend to develop.

141.   At the time of the Township's enactment of the Sump Pump Ordinance, the Sump Pump Ordinance did not apply to the proposed development of the RP Wynstone Property, as the development was proceeding under the 2007 Preliminary Approval, which was constrained by the 2005 Ordinances as modified by the Additional Ordinances.

142.   That was about to change as the Township acted in bad faith to strip RP Wynstone of the protections afforded by the 2007 Preliminary Approval and subject RP Wynstone to the newly enacted Sump Pump Ordinance, knowing that the Sump Pump Ordinance would effectively render the development financially unfeasible.

b.   The Township required withdrawal of previously submitted plans

143.   In another bait and switch, the Township then arbitrarily applied an ordinance it had never raised before (and then immediately rescinded) to strip RP Wynstone of the protection afforded by its prior approvals.

23

144.   Although the Township had accepted and reviewed the prior seven sets of revised plans (Revision Nos. 1-7) without a new SALDO application, Manager Gwynn advised RP Wynstone that going forward, applicants, including RP Wynstone, were required to submit a SALDO application with revised plans, indicating and consenting to the withdrawal of previously submitted plans pursuant to MPC §22-301(4).

145.   For the prior seven sets of revised plans (Revision No. 1-7) submitted between May 2016 to November 2018, the Township neither required RP Wynstone to submit a new SALDO application with any of the revisions nor to withdraw previously submitted revised plans.

146.   Because the development of the RP Wynstone Property was based on the 2007 Preliminary Approval, which protects RP Wynstone from any changes in ordinances that adversely impact the 2007 Preliminary Approval, and in light of the Township's past acceptance of revisions based on the 2007 Preliminary Approval, RP Wynstone challenged Manager Gwynn's new requirement that any revision going forward required withdrawal of previously submitted plans, including the Preliminarily Approved Plan approved by the 2007 Preliminary Approval.

147.   Manager Gwynn represented that even with the withdrawal of previously submitted plans, any revisions to the Approved Preliminary Plan "would still be protected by the ordinances as of the date of [RP Wynstone's] application (July 13, 2005) since the plan submitted would be a revised plan on [the Approved Preliminary Plan.]" *See* April 25, 2019, Email from Manager Gwynn, attached hereto as **Exhibit K**.

148.   The Approved Preliminary Plan, while submitted for approval on July 13, 2005, obtained preliminary approval in October 2007 subject to not only the ordinances in effect as of the date of the application, *i.e.*, the 2005 Ordinances, but also the Additional Ordinances that were expressly referenced in the 2007 Preliminary Approval.

24

149.     Because Manager Gwynn confirmed that submitted plan would be reviewed as a revision to the Approved Preliminary Plan approved by the 2007 Preliminary Approval, RP Wynstone understood the Township's statement to mean that any revisions to the Approved Preliminary Plan would similarly be subject to the ordinances upon which the Approved Preliminary Plan had been approved in the first instance, namely, the 2005 Ordinances, as modified by the Additional Ordinances (as they had been for all prior revisions).

150.     Accordingly, relying on comments and to address issues raised in the Township's professional consultants' review of Revision No. 7, and relying on Manager Gwynn's statement that any revisions to the Approved Preliminary Plan would be subject to the same ordinances that applied to the Approved Preliminary Plan, RP Wynstone prepared an eighth set of fully engineered revised preliminary plans.

151.     Interestingly, shortly thereafter, the Township enacted Ordinance 21-07. deleting §22-301(4), the purported basis for the Township's new requirement that RP Wynstone withdraw all previously submitted plans and limit governing ordinances to only the ordinances in effect at the time of the application, *i.e.*, the 2005 Ordinances, and not the Additional Ordinances.

c.     The Township's improper revocation of protective extension

152.     In the meantime, with the April 22, 2020, expiration date for the 2007 Preliminary Approval approaching, in order to avoid losing the protections afforded by the ordinances upon which the 2007 Preliminary Approval had been approved, RP Wynstone requested a one-year protective extension of the April 22, 2020 expiration date.

153.     At the November 7, 2019, Board meeting, the Township solicitor acknowledged that the MPC and the Township ordinances provide for an extension, and that "it would not be unusual" for the Township to grant the requested one-year extension.

154.     The Board, however, voted to extend the expiration date not for the requested one year, but only for only six months, from April 22, 2020 to October 22, 2020.

155.     Moreover, in order to undercut the extension provided by statute, the Board imposed an extra-statutory condition requiring RP Wynstone to present by December 7, 2019, a construction schedule of substantial completion of improvements by October 22, 2020.

156.     At the time, the Board knew well that construction had not begun.

157.     The Board also knew that considering the size of the proposed development – more than 300,000 square feet of commercial space and 700 dwelling units on approximately 200 acres of undeveloped land – substantial completion of improvements by October 22, 2020, was impossible.

158.     Moreover, nothing in the MPC or the Township ordinances require submission of plan for substantial completion of improvements for an extension to be granted.

159.     With one hand, the Township granted the statutorily provided extension provided for by the MPC and the Township ordinances (albeit only for six-month as opposed to the requested one year), and then with the other hand, took away the very extension by imposing an extra-statutory condition that the Township knew was impossible to fulfill.

160.     On or before December 7, 2019, RP Wynstone submitted a written schedule for construction of the public improvements.

161.     Manager Gwynn, by letter dated December 9, 2019, without authority and without providing the opportunity for discussion or public comment, unilaterally revoked the extension granted by the Township.

162.     The Board did not authorize Manager Gwynn to revoke the extension granted by the Township.

3597131.1

163.    This denial was merely another step to frustrate any progress and kill the RP Wynstone Development.

d.    <u>The Township refuses to apply Additional Ordinances to Revision No. 8</u>

164.    With the Preliminarily Approved Plan at risk of expiring because of Manager Gwynn's improper and unauthorized revocation of the extension, RP Wynstone submitted its eighth set of fully engineered revised preliminary plans dated December 18, 2019 ("Revision No. 8"), comprised of 187 sheets of detailed engineered drawings prepared to comply with the 2005 Ordinances as modified by the Additional Ordinances.

165.    The Township Solicitor acknowledged that with the submission of Revision No. 8, separate from the April 22, 2020, expiration date for the 2007 Preliminary Approval, MPC §508(4)(i) gives RP Wynstone "an unlimited period of time for protection from ordinance changes" while Revision No. 8 was being reviewed.

166.    Moreover, the Township accepted Revision No. 8 as a revision to the Preliminarily Approved Plan approved by the 2007 Preliminary Approval, and not as a new application, which protected RP Wynstone from any subsequent ordinances that could adversely affect RP Wynstone's right to develop in accordance with the Preliminarily Approved Plan.

167.    However, although the 2007 Preliminary Approval expressly applied the 2005 Ordinances as modified by the Additional Ordinances, the Township refused to apply the ordinances upon which the 2007 Preliminary Approval had been granted.

168.    Instead, the Township sought to apply only the 2005 Ordinances, and not the Additional Ordinances upon which the 2007 Preliminary Approval had been granted in the first place.

3597131.1

169.    Not only was the Township's sudden refusal to apply the Additional Ordinances in reviewing and processing Revision No. 8 contrary to MPC § 508(4), it required RP Wynstone to significantly alter its plans, which would further delay approval of the revised plans and potentially, RP Wynstone's overall development.

170.    The Township's refusal to apply the Additional Ordinances in reviewing and processing Revision No. 8 also impacted the necessary reviews for the development.

171.    Although the Township traffic engineer had applied both the 2005 Ordinances and the Additional Ordinances to its review of Revision Nos. 1 through 7, in a reversal of position, the Township traffic engineer, as directed by the Township, applied only the 2005 Ordinances (and not the Additional Ordinances)

172.    Not surprisingly, with confusion as to which ordinances applied to Revision No. 8, MCPC noted that "[a]bove all, it is not clear which zoning ordinance should apply to this development" and "caution[ed] the township against taking any action on this plan until clarification is reached regarding the applicable zoning and SALDO ordinances, as any review comments are speculative until that decision can be reached."

173.    On April 7, 2020, RP Wynstone filed a complaint in mandamus against the Township requiring the Township to review RP Wynstone's development plans pursuant to the ordinances specified in the 2007 Preliminary Approval, namely, the 2005 Ordinances as amended by the Additional Ordinances (the "Mandamus Action").

174.    However, continuing its efforts to chip away at the statutory protections afforded to RP Wynstone in order to obstruct RP Wynstone's development plan to increase affordable housing that would attract "those kinds of people," the Township refused to apply the Additional Ordinances to Revision No. 8.

e.    The Township refuses to properly review Revision No. 8

175.    While RP Wynstone's Mandamus Action was pending, RP Wynstone continued to engage with and address various comments raised by the Township and the Township's professional consultants.

176.    Unlike typical subdivision and land development processes in other municipalities, the Township did not schedule meetings with the Township staff and professional consultants.

177.    Instead, Manager Gwynn sent an email prohibiting counsel for Landowners from communicating with the Township professional consultants.

178.    The Township similarly would prevent the zoning officer from issuing direct guidance or interpretation on ordinances- instead routing them through counsel. This not only disrupted the ordinary flow of information, it disrupted the Landowners' ability to seek court review of those interpretations under the MPC.

179.    Such communications are elsewhere routinely part of what the Pennsylvania appellate courts have described as the give-and-take essence of subdivision and land development applications.

180.    On February 8, 2021, to address and resolve comments from Township's professional consultants regarding Revision No. 8, RP Wynstone attempted to submit 4 substitute plan drawings for one aspect of the development plan.

181.    Pennsylvania law requires Township to afford RP Wynstone the reasonable opportunity to address comments of the professional consultants and to revise its plans accordingly to address any plan deficiencies.

182.    Manager Gwynn, however, rejected the submittal of the 4 substitute plan drawings by characterizing the substitute plan drawings as a new SALDO application, and thus incomplete.

183.     In its continued effort to address and resolve comments from Township's professional consultants regarding Revision No. 8, RP Wynstone's counsel provided to special counsel for the Township an alternative sketch plan for review and comment by the Township.

184.     The alternative sketch plan (the "Alternative Plan Drawings") proposed an alternative development plan for the RP Wynstone Property, including B-2 Atrium houses, and B2 Townhouses in the TC District and B-2 Twins and B-2 Atrium houses in the TN District.

185.     These Alternative Plan Drawings would not have required waivers from the Township and should have been approved by right.

186.     Instead, Defendants sought to change the law to prevent the proposed development.

f.     The Township improperly enacts Ordinance 21-03

187.     Instead of addressing the substance of the Alternative Plan Drawings, on February 22, 2021, to counter RP Wynstone's efforts to address issues raised by the Township, Manager Gwynn recommended the adoption of two zoning ordinances, one of which, Ordinance 21-03, would completely invalidate the Alternative Plan Drawings RP Wynstone submitted earlier that month, by removing the "B-2 Atrium house" and the "B-Townhouse" uses from the TC District and removing the "B-2 Atrium house" and "B-2 Twins" uses from the TN District.

188.     Wielding and abusing its power to enact zoning ordinances affecting and discriminately targeting specific property within the Township, the Township improperly enacted Ordinance 21-03 to hinder development of the RP Wynstone Property, because RP Wynstone's development plan proposed to increase housing density within the Township by providing affordable housing options, which would have the effect of increasing the minority population within the Township.

189.     The Township's removal of "B-2 Atrium house" and the "B-2 Townhouse" uses from the TC District and the "B-2 Atrium house" and "B-2 Twins" uses from the TN District is

30

contrary to the Township's Comprehensive Plan that designates TC District to "serve as a walkable and dynamic cultural, social, and commercial center in New Hanover" and TN District to "provide for mixed-use neighborhoods that serve as a complementary residential transition between the TC District and other zoning districts."

190.    Procedurally, the Township failed to comply with the requirements set forth in MPC §609(b)(1) and §107, by failing to publish notice of a public hearing for two successive weeks, provide the full text of the proposed zoning ordinance, or provide a sufficient summary describing the Ordinance in reasonable detail.

191.    Without complying with procedural requirements, the Township enacted Ordinance 21-03 on April 7, 2021.

192.    Although Ordinance 21-03 cannot apply to Revision No. 8 and the Alternative Plan Drawings, the Township was laying the groundwork to oppose the development knowing that the Township would deny Revision No. 8, which would force RP Wynstone to submit a new subdivision land development plan, thereby subjecting RP Wynstone to all ordinances in effect at the time of the new application, including Ordinance 21-03.

193.    Rather than deal with RP Wynstone in good faith to review and process Revision No. 8, knowing that the Township would ultimately deny Revision No. 8 and RP Wynstone would have to file a new application for development, the Township used the review process to force RP Wynstone to propose alternate plans and revisions so that the Township could enact ordinances to counter RP Wynstone's alternate plans and revisions.

194.    Then, the newly enacted ordinances would already be in effect by the time RP Wynstone filed a new application, and RP Wynstone's new application would then be subject to the newly enacted ordinances.

3597131.1

195.   By continually imposing this moving target, Defendants intended to stall indefinitely, if not completely prevent, the RP Wynstone Development.

196.   On May 3, 2021, RP Wynstone challenged the Township's adoption of Ordinance 21-03 for lack of notice and the state court invalidated Ordinance 21-03 on September 20, 2021. *See* September 20, 2021, Order, attached hereto as **Exhibit L**.

g.   The Township improperly asserted RP Wynstone required further development approvals

197.   After the state court invalidated Ordinance 21-03, the Township continued to impede RP Wynstone's developmental efforts.

198.   On October 9, 2021, Manager Gwynn issued a letter asserting that the clearing performed on the RP Wynstone Property was in violation of the Township's current Soil Erosion, Sedimentation, and Grading Control Ordinance (the "E&S Ordinance") and the Township's SWM Ordinance, despite RP Wynstone receiving permits from both the Montgomery County Conservation District and the Pennsylvania Department of Environmental Protection (the "DEP").

199.   The Township directed RP Wynstone to comply with the E&S Ordinance within five (5) calendar days or face potential enforcement by the Township.

200.   Yet, the Township engineer acknowledged that the site clearing performed was permitted under the procured permits, and upon later inspection of the RP Wynstone Property, advised that its concerns had been addressed.

201.   RP Wynstone made preparations to continue development by installing sediment basins.

202.   However, shortly thereafter, Manager Gwynn issued a "Cease and Desist Notice" to RP Wynstone's attorney, asserting that further Township approvals were required to proceed, despite the DEP directing RP Wynstone to install such sediment basins.

3597131.1

h.     The Township improperly denies Revision No. 8

203.    After the state court invalidated Ordinance No. 21-03 eliminating one obstacle to enable RP Wynstone to proceed with its development as planned, the Township issued its denial of Revision No. 8 on November 19, 2021.

204.    Although there was no deadline by which the Township was required to render a decision as to Revision No. 8, despite MCPC's caution against taking any action on Revision No. 8 "until clarification is reached regarding the appliable zoning and SALDO ordinances," despite the pendency of the Mandamus Action which sought determination on the zoning and SALDO ordinances that applied to Revision No. 8, and despite RP Wynstone's request to delay a decision as to Revision No. 8 pending resolution of issues related to applicable ordinances, Manager Gwynn rescinded the unlimited time extension for review and stated the Township's intent to decide on Revision No. 8.

205.    RP Wynstone sought an injunction to stop the Township from issuing a decision on Revision No. 8 and President Judge Thomas M. DelRicci, in connection with RP Wynstone's request for a special master to address the dispute, directed the Township not to deny the application in an off-the-record conference.

206.    On November 4, 2021, the Board met to discuss Revision No. 8, during which the Township Solicitor noted that during a Planning Commission meeting "number of [the waivers] were approved … [and] a small handful were denied."

207.    With many of the requested waivers approved, Revision No. 8 should have been approved by the Township, or at a minimum, provided RP Wynstone the opportunity to address any comments with respect to the few waivers that were not approved.

208.    However, without even addressing all of the requested waivers to approve the plan, the Township ignored Judge DelRicci's directive and decided to deny Revision No. 8.

3597131.1

209.    Supervisor Snook motioned and the Board voted to deny Revision No. 8.

210.    Although the Township reviewed Revision No. 8 as a revision to the Preliminarily Approved Plan approved by the 2007 Preliminary Approval, the Township illogically and in bad faith refused to apply the Additional Ordinances in reviewing Revision No. 8.

211.    Applying only the 2005 Ordinances, and not the Additional Ordinances, the Township determined that Revision No. 8 was deficient and issued its decision denying Revision No. 8. *See* November 19, 2021, Denial Letter, attached hereto as **Exhibit M**.

212.    By denying Revision No. 8 and requiring RP Wynstone to submit a new application to develop the RP Wynstone Property, the Township deprived RP Wynstone of the protection from adverse changes in ordinances provided by the 2007 Preliminary Approval and subjected RP Wynstone to the more restrictive ordinances, including the excessive Sump Pump Ordinance enacted by the Township.

213.    RP Wynstone appealed the Township's denial of Revision No. 8 (*In re Appeal of RP Wynstone*, Montgomery County Court of Common Pleas, Case No. 2021-24529), which appeal remains pending.

214.    That Defendants went so far as to ignore statements from a Judge of the Court of Common Pleas in order to frustrate any development, further illustrates the extremes that Defendants will go to accomplish their goals.

4.    2021 New Application

215.    Because the Township rejected Revision No. 8, RP Wynstone had no choice but to submit a new application for development.

216.    On December 1, 2021, RP Wynstone submitted a new application to develop the RP Wynstone Property ("2021 New Application").

a.    The Township amended and superseded Sump Pump Ordinance to
evade challenge

217.    Prior to the Townships' November 19, 2021 denial of Revision No. 8, because of
the confusion created by the Township as to which ordinance applied to Revision No. 8 and
because the Township had indicated that Sump Pump Ordinance precluded approval of Revision
No. 8, RP Wynstone (along with RPE and Provident) had challenged the validity of the Sump
Pump Ordinance ("Sump Pump Ordinance Action").

218.    As the 2021 New Application was filed on December 1, 2021, the plan was now
subject to the Sump Pump Ordinance (enacted in 2018) with its standard of 4,000 cubic feet per
day per sump pump.

219.    Following the Sump Pump Ordinance Action, the Township acknowledged that the
Sump Pump Ordinance was unreasonable, arbitrary, and irrational and alerted Landowners of its
intent to amend the Sump Pump Ordinance to require a more reasonable standard.

220.    By amending the Sump Pump Ordinance, the Township was seeking to evade
judicial review of the Sump Pump Ordinance.

221.    However, rather than reduce the sump pump requirement from 4,000 cubic feet to
a reasonable figure, on January 3, 2022, the Township enacted Ordinance 22-01 ("Amended Sump
Pump Ordinance"), which increased the quantity of water by more than five times, from **4,000
cubic feet per day** to **0.25 cubic feet per second**, which equates to 21,600 cubic feet per day or
161,579 gallons per day.[4] *See* Ordinance 22-01, attached hereto as **Exhibit N**.

222.    In order to comply with Ordinance 22-01, RP Wynstone would now be required to
design significantly and unnecessarily oversized stormwater management systems that are several

---

[4] 1 cubic foot per second is equal to 86,400 cubic feet per day.

times larger than what is "reasonably necessary to accommodate the stormwater flowing onto their properties."

223.    For 491 residential units with basements that utilize sump pumps (as proposed in the 2021 New Application), RP Wynstone would be required to design its stormwater management system to accommodate an additional 79,335,289 gallons of water per day, or the equivalent of an additional 120 Olympic-sized swimming pools[5] worth of water.

224.    Because Ordinance 22-01 was enacted after RP Wynstone submitted its 2021 New Application on December 1, 2021, under MPC 508(4), Amended Sump Pump Ordinance does not apply to RP Wynstone's 2021 New Application.

225.    However, again ignoring MPC § 508(4), the Township has asserted that RP Wynstone's 2021 New Application is nevertheless subject to ordinances enacted after RP Wynstone's submission, including the Amended Sump Pump Ordinance requiring RP Wynstone to design its stormwater management system to accommodate an additional 79,335,289 gallons of water per day.

226.    On January 26, 2022, the Landowners filed an action to challenge the Amended Sump Pump Ordinance, *RP Wynstone, LP, et al. v. New Hanover Township*, Montgomery County Court of Common Pleas, Case No. 2022-01135 ("Amended Sump Pump Ordinance Action").

b.    The Township wrongfully disputed RP Wynstone's rightful ownership of Sewer Capacity

227.    Revealing the true intent of the Township's opposition to RP Wynstone's development – to obstruct RP Wynstone's plan by any means necessary - Defendants also questioned RP Wynstone's rightful ownership of Equivalent Dwelling Units ("EDUs") of public sewer capacity purchased by a predecessor-in-title.

---

[5] An Olympic-size swimming pool contains approximately 660,000 gallons of water.

228.    Pursuant to the terms of an EDU Purchase and Sewer Access Payment Agreement, the predecessor developer purchased 1090 EDUs of capacity in the Authority Sewer System for use by some of the RP Wynstone Properties.

229.    By the terms of that Agreement, ownership of the sewer capacity "runs with the land."

230.    As consideration for the purchase of sewer capacity, the Authority had received $3,656,950.

231.    In 2011, Turnersville, Wynstone Development Group, and RP Wynstone entered into an EDU Assignment Agreement to assign any and all interest to RP Wynstone ahead of its purchase of certain parcels that are part of the RP Wynstone Property.

232.    In 2014, the Authority voted to approve a transfer of 26 EDUs of sewer capacity by RP Wynstone to another project in the Township, the "Wetwood/Maguire Project," on the basis that RP Wynstone had provided adequate, shared ownership of the entities and the project.

233.    RP Wynstone's ownership of the EDUs was not questioned in this 2014 transfer.

234.    However, as RP Wynstone proceeded through its land development process and engaged in numerous litigations with the Township, the Township, without basis, began to dispute RP Wynstone's ownership of the EDUs.

235.    In striking contradiction, Manager Gwynn, on the one hand, disputed RP Wynstone's ownership of the EDUs, but on the other, confirmed RP Wynstone's ownership of the EDUs by suggesting that RP Wynstone transfer its EDUs to the Township for no financial consideration.

236.    On June 8, 2022, Manager Gwynn suggested that any litigation surrounding ownership could be resolved if RP Wynstone's proposed housing density was reduced by 50% and

RP Wynstone returned the amount of sewer capacity EDUs no longer required pursuant to this reduction.

237.    The value of the sewer capacity that Manager Gwynn suggested RP Wynstone return to the Township was approximately $2,000,000.00.

238.    There is no shortage of sewer capacity EDUs to service the Township as the sanitary sewer treatment plant has roughly 3,000 EDUs of available capacity, as testified to by Authority Chair Miskiewicz.

239.    During a later evidentiary hearing in connection with another matter, Manager Gwynn admitted that RP Wynstone was the owner of the EDUs.

240.    The Township's baseless dispute of ownership to obstruct development and extract substantial concessions from RP Wynstone without consideration is yet additional evidence of the Township's targeted attack on RP Wynstone.

c.    <u>Revision to 2021 New Application</u>

241.    On August 22, 2023, RP Wynstone submitted a revised set of plans ("August 2023 Revision No. 1").

242.    On October 3, 2023, the Township engineer, Knight Engineering, Inc., the latest in a revolving door of township professional consultants, issued its review of the August 2023 Revision No. 1.

243.    Among other things, the Township engineer noted requirements of the since superseded Sump Pump Ordinance codified at MPC §23-410.28.A.(2).(a) requiring the use of the figure of 4,000 cubic feet per day per sump pump.

244.    The Township engineer's use of the since superseded Sump Pump Ordinance is contrary to the Township's representation in its motion for summary judgment in the Sump Pump Ordinance Action that the Sump Pump Ordinance has been amended and superseded by the

38

Amended Sump Pump Ordinance and that the Township cannot enforce the provisions of the Sump Pump Ordinance against RP Wynstone.

245.    As a result of Defendants' unlawful conduct, RP Wynstone has been unable to develop the RP Wynstone Property.

246.    Because of Defendants' inequitable treatment of RP Wynstone, RP Wynstone will need to redesign the proposed development to remove basements, which will decrease marketability of any proposed development.

247.    Moreover, as a result of Defendants' unlawful conduct, RP Wynstone will need to incur additional cost to redesign and revise the development plan, which, even if approved by the Township, will result in delay of the development of the RP Wynstone Property.

248.    These delays are especially harmful because of changes in economic and market conditions, which will increase cost of development.

249.    As a result of Defendants' unlawful conduct, RP Wynstone has also incurred damage associated with pursuing the development in response to Defendants' unlawful conduct, as well as attorneys' fees and costs associated with the numerous civil actions RP Wynstone has had to file and litigate.

**B.    RPE Property**

250.     RPE owns thirteen (13) acres of real estate located in the Township at 1847 Swamp Pike with a Montgomery County tax parcel number 47-00-06948-00-7, also known as the McGree Tract ("McGree Tract" or "RPE Property"). *See* RPE Deed, attached hereto as **Exhibit O**.

251.    The RPE Property was in the Township's R-15 Residential District until December 2, 2021, when the Township rezoned the property to Village Mixed Use.

252.    RPE, with Select Properties, Inc. ("Select Properties") as the developer, proposes to develop the RPE Property with 51 townhome units.

253.    On April 26, 2021, Select Properties submitted a new preliminary subdivision and land development application for the RPE Property ("RPE Preliminary Application").

254.    The Township has subjected RPE to similar inequitable treatment to hinder and obstruct RPE's development of the RPE Property by:

a.   first, improperly refusing to extend a routine extension on the final approval of a development plan granted in 2015 based on the plan's noncompliance with an ordinance that was not enacted at the time and would not apply even if it had been enacted;

b.   then, enacting the excessive Sump Pump Ordinance, without notice or review, effectively prohibiting basements, which the proposed townhouses on the RPE Property included;

c.   then, after RPE filed a complaint asserting a statutory challenge to the Sump Pump Ordinance, with the newly placed roadblock to development at risk of invalidation, the Township adopted yet another roadblock, namely Ordinance 21-01, deleting a permitted use in the R-15 residential zoning district, where the RPE Property sat at the time;

d.   then, after RPE filed a notice of appeal challenging the validity of Ordinance 21-01 and submitted a new application assuming Ordinance 21-01 would be invalidated, the Township attempted to cure the procedural defect of Ordinance 21-01 by enacting Ordinance 21-04, which purports to accomplish the same thing as Ordinance 21-01;

e.   then, in order to make the development subject to the newly enacted, again procedurally defective, Ordinance 21-04, despite pending actions challenging the

40

Sump Pump Ordinance and Ordinance 21-01, the Township ignored RPE's written time extension waiver and denied RPE's new application based on RPE's noncompliance with Ordinance 21-01.

1.    The Township Improperly Refuses to Extend

255.    The Township's first step was to improperly refuse to grant a routine extension on a final approval.

256.    On July 13, 2015, Windlestrae Associates ("Windlestrae"), the predecessor-in-title, was granted final plan approval to develop a 39-unit townhouse development and a two-story commercial office building on the RPE Property ("2015 Final Approval"). *See* Resolution No. 18-15, attached hereto as **Exhibit P**.

257.    On July 23, 2018, another predecessor-in-title appeared before the Board and requested a 5-year extension of the 2015 Final Approval.

258.    At the July 23, 2018, Board meeting, a routine motion was made to grant a 3-year approval extension.

259.    At the same Board meeting, approval of the Sump Pump Ordinance (described above in Paragraphs 129-131), which added new requirements concerning the installation of new sump pump to control discharge of water, was also on the agenda.

260.    Although, pursuant to MPC §508(4), the Sump Pump Ordinance would not apply to the development plan approved by the 2015 Final Approval, Supervisor Snook stated that the "sump pump ordinance will affect the plan," and the motion to extend was defeated.

261.    The only material change in the Township's ordinances relating to land development between the date of the 2015 Final Approval and the denial of the extension request was the pending adoption of the Sump Pump Ordinance, which was the principal basis for denying the extension request.

41

262.    As stated above, the Board adopted the Ordinance 18-04 and the language of the Ordinance 18-04 was codified in §23-401.28.A(2)(a) of the SWM Ordinance, the Sump Pump Ordinance.

263.    The Sump Pump Ordinance was not only adopted without discussion, notice or review, it is excessive and effectively prohibits basements, which adversely impacts the marketability of the homes that landowners intend to develop, including the proposed townhomes on the RPE Property.

264.    Because of the Board's refusal to grant a 3-year extension on the 2015 Final Approval, the 2015 Final Approval expired and the protection from changes to adverse ordinances provided by MPC 508(4) was lost.

265.    Thereafter, RPE acquired title to the RPE Property on September 14, 2020.

266.    On November 2, 2020, RPE filed the Sump Pump Ordinance Action asserting a statutory challenge to SWM Ordinance §23-401.28.A(2)(a).

2.    The Township improperly enacts Ordinance 21-01

267.    After refusing to grant the requested extension on the 2015 Final Approval and with RPE's statutory challenge to the Sump Pump Ordinance, knowing that a developer would have to submit a new application to develop the RPE Property, Manager Gwynn recommended the adoption of Ordinance 21-01, which removed B-2 Performance Standard Development as a permitted use in R-15 and R-25 residential zoning districts.

268.    At the time, the RPE Property was in the Township's R-15 residential zoning district and RPE's proposed development relied upon B-2 Performance Standard Development as a permitted use on the RPE Property.

269.    Procedurally, the Township failed to comply with the requirements set forth in MPC §506(a), by failing to publish notice of a public hearing for two successive weeks, provide

the full text of the proposed zoning ordinance, or provide a sufficient summary describing the ordinance in reasonable detail.

270.    Based on Manager Gwynn's recommendation, on February 22, 2021, without complying with procedural requirements, the Township enacted Ordinance 21-01, which removed the B-2 Performance Standard Development as a permitted use in R-15 and R-25 residential zoning districts. *See* Ordinance 21-01.

271.    According to the Township Comprehensive Plan, R-15 Residential "is intended to provide for higher density residential development," which allows for "development of housing units with smaller lot sizes."

272.    The Township's removal of the B-2 Performance Standard Development as a permitted use in the R-15 residential zoning district is contrary to the Townships' recognition that "[m]any recent land development plans that have been built or approved over the past decade have utilized a 'performance-based' standard permitted by the township's zoning code, which allows for smaller lots in geographic areas served by public utilities."

273.    On March 26, 2021, RPE and a major home builder filed a Notice of Appeal challenging the validity of the Township's enactment of Ordinance 21-01, in the matter captioned *Real Pro Enterprises, LP, et al. v. New Hanover Township*, Montgomery County Court of Common Pleas, Case No. 2021-03983 ("Ordinance 21-01 Action").

        3.    <u>The Township improperly enacts Ordinance 21-04</u>

274.    On or about April 26, 2021, Select Properties submitted the RPE Preliminary Application with preliminary subdivision and land development plans dated April 19, 2021, for the RPE Property ("RPE Preliminary Plan"), comprised of 32 sheets of detailed engineering drawings, to develop 51 townhouse units.

275.    The RPE Preliminary Plan was substantially similar to the previously approved plan that was the subject of the 2015 Final Approval.

276.    With the Ordinance 21-01 Action pending and relying on the eventual invalidation of Ordinance 21-01, the RPE Preliminary Plan included the use of B-2 Performance Standards in the R-15 residential zoning district.

277.    The Township attempted to cure the procedural defects of Ordinance 21-01 by enacting another ordinance to again delete B-2 Performance Standards as a permitted use in R-15 and R-25 residential zoning districts.

278.    On May 6, 2021, the Township adopted Ordinance 21-04. *See* Ordinance 21-04, attached hereto as **Exhibit Q**.

279.    Ordinance 21-04 also suffers from a procedural defect as the Township failed to satisfy minimum notice requirements.

4.    The Township's Improper Denial of RPE Plan

280.    In the meantime, on April 27, 2021, the day after submission of the RPE Preliminary Application,  Manager Gwynn emailed a representative of RPE, notifying him of the Township's intent to decide on the RPE Preliminary Application on July 1, 2021, 64-days after submission, despite the 90-day review period provided under 53 P.S. § 10508 and the duty of good faith and fair dealing between the Township and RPE inherent in the subdivision and land development review process, because RPE did not submit an unlimited time extension waiver.

281.    After receiving the Township's professional consultants' review letters, which were significant in length, on June 4, 2021, RPE provided written waiver of the ninety (90) day requirement for a decision on the RPE Preliminary Application. *See* Email dated June 4, 2021, attached hereto as **Exhibit R**.

282.     Five days later, at its public meeting on June 9, 2021, notwithstanding RPE's written time extension waiver, the Township Planning Commission not only discussed the RPE Preliminary Application, but decided to recommend denial of the RPE Preliminary Application, in part, because B-2 Performance Standards are not a permitted use in the R-15 residential zoning district.

283.     At the July 1, 2021, Board of Supervisor meeting, RPE noted modifications to the RPE Preliminary Plan removing all basements and making all homes three-stories to address comments made by the Township's professional consultants.

284.     RPE also noted the pending litigation and requested more time to revise the RPE Preliminary Plan to address the comments of Township's professional consultants.

285.     Citing RPE's inability to comply with zoning requirements since the Township no longer permits B-2 Performance Standards, Supervisor Snook moved to deny the RPE Preliminary Application and the Board denied the Application.

286.     On July 13, 2021, Township Solicitor issued the written decision denying the RPE Preliminary Application.

287.     The Township Solicitor specifically noted that Ordinance 21-01 deleted B-2 Performance Standards as a use permitted in the R-15 residential zoning district and because RPE would not agree to revise the RPE Preliminary Plan to remove B-2 Performance standards, more time to revise the RPE Preliminary Plan could not result in a plan that complied with Ordinance 21-01.

288.     The Township Solicitor, however, knew that Ordinance 21-01 was being challenged and, if invalidated, B-2 Performance Standards would continue to qualify as a use permitted in the R-15 residential zoning district.

289.    Under MPC § 915.1(a), the Township was not permitted to render a decision on the RPE Preliminary Application during the pending litigation.

290.    The Township failed to stay its processing of the RPE Preliminary Application while Ordinance 21-01 was being challenged in the Ordinance 21-01 Action and denied the Application without allowing RPE a reasonable opportunity to respond to comments or revise its plans.

291.    In order to make development of the RPE Property subject to the newly enacted Ordinance 21-04, despite pending litigations challenging the Sump Pump Ordinance and Ordinance 21-01, the Township ignored RPE's written time extension waiver, and improperly denied the RPE Preliminary Application based on the plan's noncompliance with Ordinance 21-01.

292.    As expected, on November 1, 2021, following oral argument, the state court in the Ordinance 21-01 Action declared Ordinance 21-01 invalid and void. *See* November 1, 2021, Order, attached hereto as **Exhibit S**.

293.    In the court's opinion, the court also noted that the Township's attempt to cure its defect by enacting Ordinance 21-04 to delete the very same permitted use deleted by the invalid Ordinance 21-01 also suffered from a procedural defect.

294.    Because of Defendants' inequitable treatment of RPE, RPE has been unable to develop the RPE Property.

295.    Because of Defendants' inequitable treatment of RPE, RPE will need to redesign the development to remove basements, which will decrease marketability of any proposed development.

296.     Moreover, as a result of Defendants' unlawful conduct, RPE will need to incur additional cost to redesign and resubmit a new application for development of the RPE, which, even if approved by the Township, will result in delay of the development of the RPE Property.

297.     These delays are especially harmful because of changes in economic and market conditions, which will increase cost of development.

298.     As a result of Defendants' unlawful conduct, RPE has also incurred damage associated with pursuing the development in response to Defendants' unlawful conduct, as well as attorneys' fees and costs associated with the numerous civil actions RPE has had to file and litigate.

**C.      Provident Property**

299.     Provident acting for the benefit of the Goldthorp IRA and the Heckler IRA, is the legal owner of a 16.2 acre property in the Township, tax parcel number 47-00-03360-01-3 ("Provident Property"). *See* Provident Deed, attached hereto as **Exhibit T**.

300.     On or about June 5, 2020, Provident entered into an agreement with a residential homebuilder to subdivide and develop the Provident Property with single-family residential dwelling units that included basements.

301.     Because of the excessive requirements of the Sump Pump Ordinance, the residential homebuilder determined that it was not economically feasible to develop the property at the price per lot and terminated the agreement on January 19, 2021.

302.     If not for the excessive and unreasonable Sump Pump Ordinance, Provident would be able to develop the Provident Property with basements.

303.     Because of Defendants' inequitable treatment of Provident, Provident has been unable to develop the Provident Property.

304.    Because of Defendants' inequitable treatment of Provident, Provident will need to redesign the development to remove basements, which will decrease marketability of any proposed development.

305.    Moreover, as a result of Defendants' unlawful conduct, Provident will need to incur additional cost to redesign and resubmit a new application for development of the Provident Property, which, even if approved by the Township, will result in delay of the development of the Provident Property.

306.    These delays are especially harmful because of changes in economic and market conditions, which will increase cost of development.

307.    As a result of Defendants' unlawful conduct, Provident has also incurred damage associated with pursuing the development in response to Defendants' unlawful conduct, as well as attorneys' fees and costs associated with the numerous civil actions Provident has had to file and litigate.

### D.    Defendants Could Not Have Committed Their Scheme Without the Complicity of the Engineers

308.    As described above, Defendants plan to frustrate and defeat developments relied in part on distorting the ordinary review process, shifting interpretations of ordinances, and preventing clear guidance from the professional engineers it retained.

309.    As a result, the engineers played a pivotal role in this scheme.

310.    The cooperation of the engineers made the plan to stop all development much more effective and provided a tool to drive up the costs of any proposed development through the ongoing pattern of reversals, bad-faith review, and shifting interpretations that hampered Plaintiffs at every turn.

3597131.1

311.    As the municipal engineers retained by Defendant Township, Cedarville, Flinchbaugh, and Knight, and Gray acted as agents for Defendant Township.

312.    As experienced municipal engineers, Cedarville and Knight were aware that Defendant Township was not reviewing these proposals in good faith or in keeping with any typical review process.

313.    On information and belief, the engineers were aware of the intent to stop development by any means necessary and actively participated in that effort.

314.    On information and belief, the engineers aided and abetted the unlawful targeting of Plaintiffs.

315.    On information and belief, Defendant Cedarville quit serving as the municipal engineer in late 2022.

316.    On information and belief, the pressure from the Defendants to participate in this unlawful scheme was part of the reason Defendant Cedarville stopped working with Defendant Township.

317.    Defendant Knight, through its employee Gray, continues to participate in its role as municipal engineer.

## **COUNT I**

### **Plaintiffs v. All Defendants**

### **42 U.S.C. §1983, Substantive Due Process of the Fourteenth Amendment**

318.    Plaintiffs incorporate herein by reference the allegations contained in all of the preceding paragraphs above as though set forth in their entirety.

319.    Defendants, under color of state law, have intentionally, purposefully, and with deliberate indifference, violated Plaintiffs' substantive due process under the Fourteenth

Amendment to the United States Constitution and 42 U.S.C. §1983 by depriving Plaintiffs of their reasonable use of their property.

320.     Plaintiffs, with legal or equitable ownership in their properties, have a fundamental property interest in their ownership of land.

321.     As stated above, Defendants have violated substantive due process by severely restricting and hampering Plaintiffs' development of their properties and interfering with Plaintiffs' reasonable use of their properties by:

  a. Arbitrarily and inconsistently applying ordinances in order to drive up cost of development and to ultimately deny land development;

  b. Denying protections afforded by the MPC to deny previously approved land development application;

  c. Arbitrarily and irrationally enacting ordinances that unreasonably increase water quantity requirements for sump pump in a way that makes constructing new homes economically unfeasible;

  d. After admitting that the water quantity requirements for sump pump were unreasonable and excessive, in response to and in retaliation for Plaintiffs' challenge of the sump pump requirement, arbitrarily and irrationally enacting a superseding ordinance that further increases the water quantity requirements for sump pump;

  e. Enacting restrictive ordinances without requisite procedural notice;

  f. Arbitrarily and irrationally enacting unreasonably restrictive ordinances in order to deprive Plaintiffs of permitted uses in order to frustrate Plaintiffs' development of their properties; and

g.  Refusing to stay the processing of land development applications while ordinances restricting permitted uses were actively being challenged.

322.  In short, Defendants' conduct creates an ever-shifting framework of changing laws and arbitrary requirements, making it effectively impossible for Plaintiffs to develop the properties.

323.  Any effort to comply with these requirements are ineffective, because Defendants simply change the rules again, imposing large expenses on Plaintiffs and effectively halting any forward progress.

324.  This conduct alone violates Plaintiffs' rights.

325.  However, Defendants actions are also tainted with unlawful bias.

326.  The Defendants interfered with Plaintiffs' reasonable use of their properties because Plaintiffs propose to provide affordable housing options which will increase housing density within the Township and result in increasing the population of minorities within the Township, changing the community character of the Township, which is 95% white.

327.  Defendants' actions are motivated, in whole or in part, by troubling racial bias, illustrated by the Township's appointment of Sgt. Moyer to the Planning Commission, the use of coded language reflecting an intent to exclude minorities, and the extreme measures Defendants have taken to shut down development at all costs.

328.  Defendants' actions are unrelated to public health, safety, morals, and general welfare and are contrary to the Township's own Comprehensive Plan for the Township.

329.  Plaintiffs' proposed plan to develop their properties to provide affordable housing options within the Township, which will increase housing density in accordance with the

Township Comprehensive Plan and will increase the racial makeup of the Township is a reasonable use of Plaintiffs' properties.

330.   Defendants' coordinated and concerted action to deprive Plaintiffs of the reasonable use of their properties evidences Defendants' intent to cause harm, or at minimum, deliberate indifference or gross negligence as to the harm caused by Defendants.

331.   There is no rational basis for Defendants to obstruct Plaintiffs' proposed development of their properties.

332.   But for Defendants' improper enactment and application of ordinances and arbitrary and irrational processing and review of Plaintiffs' land development applications, Plaintiffs would be able to develop their properties and enjoy the benefits of use of their properties.

333.   As a result of the Defendants' actions, Plaintiffs have suffered constitutional deprivation, as well as resulting economic damages.

334.   Defendants have forced Plaintiffs to incur excessive engineering, legal, and other professional expenses to comply with their ever-shifting and unconstitutional requirements.

335.   Moreover, Plaintiffs have been unable to develop their properties as planned.

336.   Given the size of the overall proposed developments, Plaintiffs have sustained damages in excess of $150,000,000.00.

## COUNT II

### Plaintiffs v. All Defendants

### 42 U.S.C. § 1983, Equal Protection Clause of the Fourteenth Amendment

337.   Plaintiffs incorporate herein by reference the allegations contained in all of the preceding paragraphs above as though set forth in their entirety.

338.   Defendants, under color of state law, have intentionally, purposefully, and with deliberate indifference, violated Plaintiffs' rights and privileges under the Fourteenth Amendment

to the United States Constitution and 42 U.S.C. §1983 by depriving treating Plaintiffs differently and in a discriminatory manner.

339.     As stated above, Defendants have violated substantive due process by severely restricting and hampering Plaintiffs' development of their properties and interfering with Plaintiffs' reasonable use of their properties by:

a.   Arbitrarily and inconsistently applying ordinances in order to drive up cost of development and to ultimately deny land development;

b.   Denying protections afforded by the MPC to deny previously approved land development application;

c.   Arbitrarily and irrationally enacting ordinances that unreasonably increase water quantity requirements for sump pump in a way that makes constructing new homes economically unfeasible;

d.   After admitting that the water quantity requirements for sump pump is unreasonable and excessive, in response to and in retaliation for the Landowner's challenge of the sump pump requirement, arbitrarily and irrationally enacting a superseding ordinance that further increases the water quantity requirements for sump pump;

e.   Enacting restrictive ordinances without requisite procedural notice;

f.   Arbitrarily and irrationally enacting unreasonably restrictive ordinances in order to deprive Landowners of permitted uses in order to frustrate Landowner's development of their properties;

g.   Refusing to stay the processing of land development applications while ordinances restricting permitted uses were actively being challenged; and

h.   Disputing RP Wynstone's rightful ownership of certain EDUs without basis.

340.    Defendants have treated Plaintiffs, who propose large subdivision and land development plans with medium to high density housing, unjustifiably different than other landowners, who do not propose large subdivision and land development plans or medium to high density housing.

341.    Numerous other property owners in the Township who do not propose large subdivision and land development plans or medium to high density housing, have obtained land development approval without having applicable ordinances changed within the middle of review process, being subjected to newly enacted ordinances that are contrary to the Township's Comprehensive Plan or are admittedly unreasonably restrictive, having development applications denied while ordinances were actively being challenged.

342.    The selective treatment was motivated by an intent to inhibit the exercise of Plaintiffs' constitutional rights to their fundamental property rights and discriminate on the basis of impermissible and unreasonable considerations, including Plaintiffs' proposal to build high-density residential units, such as apartments and other multi-family units, which will consequently increase the minority population within the Township, thereby changing the community character of the Township which is 95% white.

343.    There is no rational basis for the difference in treatment Plaintiffs have received.

344.    In fact, the Township has treated Plaintiffs differently because Plaintiffs propose to build apartments and other multi-family units and townhouses that do not "fit" with the "community character" of the Township, which consists primarily of single-family detached dwelling units and because the increase in high density housing is likely to attract "those kinds of people," *i.e.*, minorities, to the Township which is 95% white.

345.    Targeting Plaintiffs for the improper purpose of obstructing Plaintiffs' development plans to increase housing density within the Township so that the Township can maintain its 95% white community character of Township is not a rational government interest.

346.    The intentional decision to target Plaintiffs is not being applied equally to similarly situated individuals.

347.    The ongoing and concerted actions over the course of years to target Plaintiffs constitute a pattern or practice.

348.    There is no rational basis for Defendants to obstruct Plaintiffs' development of their properties.

349.    As a result of Defendants' actions, Plaintiffs have suffered constitutional deprivation, as well as resulting economic damages.

350.    As a result of Defendants' actions, Plaintiffs have been unable to develop their properties as planned and have sustained damage in excess of $150,000,000.00.

<u>**COUNT III**</u>

<u>**Plaintiff v. All Defendants**</u>

<u>**Civil Conspiracy**</u>

351.    Plaintiffs incorporate herein by reference the allegations contained in all of the preceding paragraphs above as though set forth in their entirety.

352.    To the extent that the Individual Defendants are not considered as state actors, they have conspired with one another to violate Plaintiffs' rights and privileges under the Fourteenth Amendment and to interfere with Plaintiffs' development of their properties as stated above.

353.    To the extent that the Individual Defendants are not considered as state actors, they have in fact carried out their conspiracy by violating Plaintiffs' rights and privileges under the

Fourteenth Amendment and interfering with Plaintiffs' development of their properties as stated above.

354.    As a direct and proximate result of the Individual Defendants' acts, Plaintiffs have suffered damages.

355.    As a result of the Individual Defendants' actions, Plaintiffs have been unable to develop their properties as planned and have sustained damage in excess of $150,000,000.00.

356.    Individual Defendants' acts were intentional, willful, wanton, and/or reckless, warranting the imposition of punitive damages against them.

**WHEREFORE**, Plaintiffs RP Wynstone, AT Realty, AKM Properties, Trollyline, General Hancock, RPE, Provident, Goldthorp IRA and Heckler IRA respectfully request that this Honorable Court:

a.  Declare Defendants have violated the rights of Plaintiffs, as set forth above;

b.  Enjoin Defendants from continuing the discriminatory practices, as set forth above;

c.  Award compensatory damages to Plaintiff and against Defendants, jointly and severally,

d.  Award punitive damages against the Individual Defendants, to the extent permitted by law, in an amount sufficient to deter the discriminatory conduct set forth in above;

e.  Award punitive damages against the Individual Defendants;

f.  Award Plaintiffs their costs and reasonable attorney fees;

g.  Award such other relief as the Court deems appropriate.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs respectfully demand a trial by jury on all claims and issues so triable.

KANG HAGGERTY LLC

By:*/s/ Kyle Garabedian*_____

56

Edward T. Kang
Susan Moon O
Kyle Garabedian
123 South Broad Street, Suite 1670
Philadelphia, PA 19109
ekang@kanghaggerty.com
so@kanghaggerty.com
kgarabedian@kanghaggerty.com

*Counsel for Plaintiffs*

Dated: March 5, 2024