IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RP WYNSTONE, LP, ET AL.,

               Plaintiffs,

    v.

NEW HANOVER TOWNSHIP, ET AL.,

               Defendants.

CIVIL ACTION
NO. 24-959

## OPINION

**Slomsky, J.**                                         **February 5, 2025**

**I.    INTRODUCTION** ............................................................................... 5

**II.   BACKGROUND** ................................................................................ 6

  A.  Parties ......................................................................................... 6

  B.  Summary of Parties' Arguments ................................................. 9

  C.  Amended Complaint .................................................................. 10

**III.  FACTS** ............................................................................................ 12

  A.  RP Wynstone's New Development Plans, Agreement on Applicable Ordinances, and Allegations of Improper Conduct of Township and Other Defendants ...................... 12

    1.  2007 Preliminary Approval ................................................. 13

    2.  Revised Plan Submissions (Revision Nos. 1-7) and Reviews .................................. 14

    3.  Township's Alleged Coordinated Actions to Obstruct Development and Curb Racial Diversity ......................................... 15

      a.  Sump Pump Ordinance ............................................... 15

   b. Township Requires Withdrawal of Previously Submitted Plans ........................... 16

   c. Township's Revocation of Protective Extension ..................................... 17

   d. Township Refuses to Apply Additional Ordinances to Revision No. 8 ................. 18

   e. Township Refuses to Properly Review Revision No. 8 ........................... 19

   f. Township Improperly Enacts Ordinance 21-03 ..................................... 19

   g. Township Asserts RP Wynstone Requires Further Development Approvals.......... 20

   h. Township Denies Revision No. 8 ..................................................... 21

  4. 2021 New Application for RP Wynstone Property ..................................... 21

   a. Township Amends and Supersedes Sump Pump Ordinance
    Allegedly to Evade Judicial Challenge ................................................ 21

   b. Township Disputes RP Wynstone's Ownership of Sewer Capacity ...................... 22

   c. Revision to 2021 New Application of RP Wynstone ............................... 22

 B. RPE Plaintiff Alleges It Was Treated Unfairly ..................................... 23

 C. Provident Plaintiffs Allege They Received Unfair Treatment ........................... 25

 D. Plaintiffs Contend Defendants' Actions Were Motivated by Racial Animus.................... 26

 E. Amended Complaint Alleges Cedarville and Knight Defendants Were Complicit in
  Township Defendants' Scheme to Thwart Plaintiffs' Development ................................. 28

 F. Plaintiffs Allege Defendants' Conduct Caused Their Damages ......................... 28

IV. PROCEDURAL HISTORY ................................................................. 30

V. STANDARD OF REVIEW ................................................................. 30

 A. Standard on a Motion to Dismiss Pursuant
  to Federal Rule of Civil Procedure (12)(b)(6) ..................................... 30

B.  Standard on a Motion to Dismiss for Lack of Standing
    Under Federal Rule of Procedure 12(b)(1) ........................................................ 32

**VI. ANALYSIS** ............................................................................................................ 33

A.  Plaintiffs Have Failed to Allege a Violation of Equal Protection
    Under the Fourteenth Amendment to the United States Constitution .............................. 33

    1.  Plaintiffs Were Not Singled Out Because Defendants Denied
        All Development in the Township .............................................................. 34

        a.  RP Wynstone Plaintiffs Have Not Shown They Were Treated
            Differently From Other Developers ...................................................... 34

        b.  RPE Plaintiff Has Not Shown They Were Treated Differently
            From Other Developers .................................................................. 35

        c.  Provident Plaintiffs' Claim That the Sump Pump Ordinance Was Enacted
            to Discriminate Against Them Is Meritless ............................................. 36

    2.  Plaintiffs Do Not Link Allegations of Racism by Sgt. Moyer
        to Defendants' Actions at Issue in This Case ............................................... 36

    3.  Township Officials' Conduct Passes the Rational-Basis Test ................................. 38

    4.  Plaintiffs Do Not Have Standing To Support an Equal Protection Claim
        Based on Racial Animus ...................................................................... 40

    5.  Plaintiffs' Argument That They Are a Class of One Fails ..................................... 42

B.  Plaintiffs Do Not State a Claim for Deprivation of Substantive Due Process
    Under the Fourteenth Amendment ................................................................... 44

    1.  Plaintiffs Fail to Plausibly Allege That Defendants' Actions Were
        Arbitrary or Irrational and Not Pursuant to a Legitimate State Interest ................... 44

C.  Plaintiffs Do Not Plead a Plausible Claim of Conspiracy ........................................ 49

D.  The Claims Are Barred by the Applicable Statute of Limitations .................................. 51

    1.  Plaintiffs' Claims Are Time-Barred From the Face of the Amended Complaint ............... 51

     a.    From the Face of the Amended Complaint, It Is Clear That the Statute of Limitations Has Run on All Claims Asserted by Provident Plaintiffs and RPE Plaintiff ........................................................................................... 52

        i.    Regarding Provident Plaintiffs ................................................................. 52

       ii.   Regarding RPE Plaintiff ........................................................................... 52

     b.    From the Face of the Amended Complaint, It Is Clear That the Statute of Limitations Has Also Run on the Claims Asserted by RP Wynstone Plaintiffs ...... 53

  2.    The Continuing Violation Doctrine, an Exception to the Timely Filing Requirement, Does Not Overcome the Statute of Limitations Violation ................. 53

     a.    The Two Discrete Acts That Fall Within the Statute of Limitations Are Not Within the Continuing Violation Doctrine .................................................. 53

        i.    The Offer to Settle the Case ..................................................................... 54

       ii.   Knight Engineering's Review of RP Wynstone's Revised Plans ........................... 55

E.  Because Plaintiffs Do Not Plausibly Allege Constitutional Violations, Qualified Immunity Applies in This Case .......................................................... 56

  1.    Persons Who Have Been Sued in Their Individual Capacity Are Cloaked With Qualified Immunity ...................................................... 56

  2.    Persons Who Have Been Sued in Their Official Capacity ......................... 57

**VII.  CONCLUSION** ................................................................................ 58

## I.    INTRODUCTION

This case arises from Plaintiff landowners' failure to develop thus far new residential and commercial buildings on approximately 203 acres of land in New Hanover Township in Montgomery County, Pennsylvania. Defendants are New Hanover Township and its officials and related entities involved in land development in the Township. As summarized by this Court in a prior Opinion (Doc. No. 53):

> [Plaintiffs] started by having a plan preliminarily approved and proceeded to implement the plan. Things got complicated, leading Plaintiffs to file ten (10) cases, currently pending in state court, questioning either the validity of state ordinances or the application of those ordinances to their development plan. Not satisfied with those pending lawsuits, Plaintiffs filed this case in federal court alleging . . . Defendants engaged in a civil conspiracy to thwart the developers' plans by reviewing their applications in bad faith as well as enacting ordinances and manipulating the applicability of those ordinances to place obstacles in Plaintiffs' path, in violation of Plaintiffs' property rights. (See Doc. No. 50 ["Amended Complaint" or "Compl."] at ¶¶ 3, 4, 352–56).

> Further, Plaintiffs claim the alleged misconduct was extreme and [egregious] and guided by racial animus—insofar as Defendants wanted to prevent any increase in the population of racial minorities in a town that is 95% white—in violation of 42 U.S.C. § 1983[1] and the Equal Protection and Substantive Due Process Clauses of the Fourteenth Amendment to the United States Constitution. (See id. at ¶¶ 5, 319–350.)[2] Plaintiffs allege that Defendants conspired, acting under color of state

---

[1]    42 U.S.C. § 1983, which allows persons to sue state actors for violating federal rights, provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

[2]    The Fourteenth Amendment provides:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person

law, to deprive Plaintiffs of their constitutional right to use their land, causing significant damages, and seek monetary and injunctive relief.  (See id.)

(Doc. No. 53 at 3, 5.)

## II.    BACKGROUND

### A.    Parties

Regarding the parties in this case, the Court described them in a prior Opinion (Doc. No.

53) as follows:

Plaintiffs are landowners of various parcels of real property.  They consist of entities and individuals, totaling nine (9) plaintiffs.  They are grouped together as follows:

- RP Wynstone, LP ("RP Wynstone") and the following related entities:
  - AT Realty, LP ("AT Realty")
  - AKM Properties, LP ("AKM Properties")
  - Trollyline Enterprises, LP ("Trollyline")
  - General Hancock Partnership Enterprises, LP ("General Hancock")

These entities will be referred to as the RP Wynstone Plaintiffs.

- Real Pro Enterprises, LP ("RPE" or  "RPE Plaintiff")

- Provident Trust Group, LLC ("Provident") for the benefit of the following related individuals:

  - Benjamin Goldthorp Roth IRA
  - Clayton Heckler IRA

These entities will be referred to as the Provident Plaintiffs.

There are seventeen (17) Defendants in this case, divided into three (3) groups. The first group (collectively "Township Defendants") is as follows:

- The Board of Supervisors of New Hanover Township (the "Board")

- The following members of the Board: (the "Individual Defendants"):

---

of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1.

- o   William Ross Snook ("Supervisor Snook")
- o   Kurt Zebrowski ("Supervisor Zebrowski")
- o   Marie Livelsberger ("Supervisor Livelsberger")
- o   Boone Flint ("Supervisor Flint")
- o   Charles Garner ("Supervisor Garner")

These entities will be referred to as the Board Defendants.

- • Township official Jamie Gwynn ("Manager Gwynn"), who communicated with Plaintiffs about their development plans.

- • Other Township officials, including:

  - o   Thomas Miskiewicz ("Sewer Authority Chair Miskiewicz")
  - o   William Moyer ("Planning Commission Member Moyer" or "Sgt. Moyer")
  - o   Susan Smith ("Planning Commission Vice Chair Smith")
  - o   Russel Oister ("Planning Commission Chair Oister")

- • New Hanover Township (the "Township")[3]

- • New Hanover Township Authority ("Sewer Authority")

  The second group of Defendants are as follows:

- • Cedarville Engineering Group, LLC ("Cedarville") and a related individual:

  - o   Robert Flinchbaugh ("Flinchbaugh")

Cedarville and Flinchbaugh will be referred to as the Cedarville Defendants.

  The third group of Defendants are as follows:

- • Knight Engineering Inc. ("Knight") and a related individual

  - o   Daniel Gray ("Gray")

Knight and Gray will be referred to as the Knight Defendants.

  (See Doc. No. 53 at 3–5, citing Compl. ¶¶ 12–36.)

---

[3]   The Township consists of 13,880 acres of land, and as of 2018 had a population of 13,035. (Compl. at ¶ 66.)

Plaintiffs are legal or equitable owners of various real property in the Township and seek to develop their properties through medium and/or high density residential and commercial developments.  (Id. at ¶ 37.)  RP Wynstone, AT Realty, AKM Properties, Trollyline, General Hancock, and RPE are Pennsylvania limited partnerships.  (Id. at ¶¶ 12–17.)  RP Wynstone and its related entities, AT Realty, AKM Properties, Trollyline, and General Hancock own eleven (11) parcels of land in the Township.  (Id. at ¶ 90.)  RPE is a limited partnership, which owns thirteen (13) acres of real estate in the Township, also known as the McGree tract.  RPE proposes to develop its property in the Township with 51 townhome units.  (See id. at ¶¶ 250, 252.)  Provident, a Nevada limited liability company, acting for the benefit of the Goldthorp IRA and the Heckler IRA, owns a 16.2-acre property in the Township.  (Id. at ¶¶ 18, 299.)

Defendant Township is a municipality organized under the laws of Pennsylvania.

Township Board members are elected and serve six-year terms governing the Township. The Board was comprised of five Supervisors during the relevant time period:  Defendant Supervisors Snook, Zebrowski, and Livelsberger since 2018, Supervisor Flint since 2020, and Supervisor Garner from 2016 to 2021.  Defendant Manager Gwynn is the Township Manager.

Defendant Sewer Authority is a Pennsylvania municipal authority.  Defendant Thomas Miskiewicz was the chair of the Sewer Authority during the relevant time period.

Defendant Russel Oister was the Chair of the Township Planning Commission since 2021. Defendant Susan Smith is Vice Chair of the Township Planning Commission since approximately 2004 and a past Chairperson.  (See id. at ¶¶ 19–30.)  Defendant Sgt. Moyer is a member of the Township Planning Commission since 2022.  Before joining the Planning Commission, he worked

in the Township's police department and before that he was the town's fire chief.  (See id. at ¶¶ 31, 41.)[4]

Defendant Cedarville is a municipal engineering firm retained by the Township.  Cedarville was hired by the Township starting in February 2021. Cedarville terminated that relationship for "general business reasons" on November 22, 2022.[5]  (See Doc. No. 35-1 at 2.)  Cedarville issued three (3) letters, dated May 26, 2021, January 31, 2022, and May 26, 2022, regarding the development of Township land with engineering recommendations.  (Id.)

Defendant Flinchbaugh is an engineer employed by Cedarville hired to act as the Township's municipal engineer.  Defendant Knight is the engineering firm currently retained by the Township, and Defendant Gray is an engineer employed by Knight to act as the Township's municipal engineer.  (See id. at ¶¶ 32–35.)

### B.    Summary of Parties' Arguments

Defendants move to dismiss the Amended Complaint on five grounds:  (1) the facts pled do not establish a violation of Plaintiffs' rights under either the Equal Protection or the Substantive Due Process Clauses of the Fourteenth Amendment to the United States Constitution; (2) the facts pled do not establish a conspiracy to violate Plaintiffs' constitutional rights; (3) Plaintiffs lack standing to assert any claim based on racial animus in violation of the Equal Protection Clause because they were not directly or imminently harmed by Defendants' conduct; (4) all but two of the events that gave rise to the claims in the Amended Complaint took place between July 2005

---

[4]    Sgt. Wililam Moyer was not on the Planning Commission during the time of the critical events being challenged by Plaintiffs.  He was put on the Commission in 2022.  (Compl. at ¶ 31.)

[5]    Cedarville Defendants attach as Ex. "B" to their Motion to Dismiss the Complaint the Notice of Termination.  (Doc. No. 35-1.)

and January 2022, and therefore the claims are barred by the applicable statute of limitations; and (5) certain individual defendants are entitled to qualified immunity.  (Doc. No. 30-1 at 3–4, 19.)

In response, Plaintiffs contend that (1) sufficient facts are alleged to establish a violation of Plaintiffs' rights under both the Equal Protection and the Substantive Due Process Clauses of the Fourteenth Amendment to the United States Constitution; (2) sufficient facts are alleged to establish a civil conspiracy to violate the Equal Protection and Substantive Due Process Clauses of the Fourteenth Amendment to the United States Constitution; (3) they have standing to raise the Equal Protection violation because they have sufficiently alleged harm caused by Defendants' conduct based on race; (4) their claims are not time-barred because Defendants engaged in a continuing pattern of conduct, and (5) qualified immunity does not attach to any individual Defendant.  (See generally Doc. No. 42.)

For the reasons that follow, Township Defendants' Motion to Dismiss the Complaint (Doc. No. 30), and Cedarville and Knight Defendants' Motions to Dismiss the Complaint (Doc. Nos. 34, 35) will be granted.

### C.    Amended Complaint

Plaintiffs' Amended Complaint (Doc. No. 50) consists of 356 paragraphs.  About 300 paragraphs essentially deal with the submission of revisions to Plaintiffs' development plans, applicable ordinances, and all of the interactions Plaintiffs had with Township officials over the years in seeking the approval for their development plans.  About 31 paragraphs deal with allegations about how Township officials, in dealing with Plaintiffs' development plans for high-density housing, were motivated by their desire to keep minorities out of the Township.  As an example, the Amended Complaint alleges:

> 39.  With changes in the elected Township officials and with the recent influx of new residents, the Township has engaged in a concerted effort to reduce or stifle housing density in new residential developments by hindering and denying

subdivision and land development applications for the purpose, inter alia, of limiting affordable housing and maintaining the predominantly white racial makeup of the Township.

(Id. at ¶ 39.)

Toward the end of the Amended Complaint, Plaintiffs expand on their theory of unequal treatment by alleging disparate treatment in several paragraphs:

340.  Defendants have treated Plaintiffs, who propose large subdivision and land development plans with medium to high density housing, unjustifiably different than other landowners, who do not propose large subdivision and land development plans or medium to high density housing.

341.  Numerous other property owners in the Township who do not propose large subdivision and land development plans or medium to high density housing, have obtained land development approval without having applicable ordinances changed within the middle of review process, being subjected to newly enacted ordinances that are contrary to the Township's Comprehensive Plan or are admittedly unreasonably restrictive, having development applications denied while ordinances were actively being challenged.

342.  The selective treatment was motivated by an intent to inhibit the exercise of Plaintiffs' constitutional rights to their fundamental property rights and discriminate on the basis of impermissible and unreasonable considerations, including Plaintiffs' proposal to build high-density residential units, such as apartments and other multi-family units, which will consequently increase the minority population within the Township, thereby changing the community character of the Township which is 95% white.

***

344.  The Township has treated Plaintiffs differently from other developers because Plaintiffs propose to build units "that do not 'fit' with the 'community character' of the Township, which consists primarily of single-family detached dwelling units and because the increase in high density housing is likely to attract . . . minorities, to the Township which is 95% white.

(Id. at ¶¶ 340–44.)

At the end of the 356 paragraphs, there are a number of legal conclusions relating to the alleged violations.  According to the Amended Complaint, the delay in the development of RP Wynstone, RPE, and Provident's plans were allegedly caused by Defendants, which was

11

"especially harmful because of changes in economic and market conditions, which will increase

cost of development."  (Id. at ¶¶ 248, 297, 306.)

III.    FACTS[6]

In the Amended Complaint, Plaintiffs allege the following that pertain to all parties:

84. . . . Defendants have sought to use the numerous legal actions  . . .  to pressure the Landowners into reducing the proposed housing density by 50%, which requires the Landowners to completely redesign the proposed land development and significantly reduces the profits of the proposed developments.

85.  Consistent with their apparent objective of restricting growth and increased diversity, the Township has effectively stopped all building and land development.

86.  In the last several years, while the Township has approved minor subdivisions, the Township has not approved any major subdivision and land development plans.

87.  In 2022, the only approved land development was for a storage tank for a public utility.

***

89.  Because the Landowners propose major subdivision and land developments that will increase housing density within the Township, and thus impact the minority makeup of the Township, Defendants have treated the Landowners differently from other property owners in the Township.

(Id. at ¶¶ 84–89.) The specific allegations in the Amended Complaint pertaining to each

Plaintiff follow.

### A.  RP Wynstone's New Development Plans, Agreement on Applicable Ordinances, and Allegations of Improper Conduct of Township and Other Defendants

Broadly speaking, the Amended Complaint alleges the following regarding RP Wynstone

Plaintiffs:

As a significant development that would increase affordable housing inventory and accordingly promote racial diversity, Defendants undertook a concerted plan to stop

---

[6]    The facts alleged in this section are sourced from the Amended Complaint and accepted as true at the Motion to Dismiss stage of the case.

the RP Wynstone Development, by imposing burdensome requirements, rescinding prior approvals, taking steps to make it economically unfeasible, and otherwise halt its progress . . . The following history of the approval process for the RP Wynstone Development illustrates the length of time that this project has languished:

(Id. at ¶¶ 93, 94.)[7]

### 1.    2007 Preliminary Approval

On July 13, 2005, initial plans for the RP Wynstone Development were submitted to the Township.  (Id. at ¶ 95.)  On October 22, 2007, the Township granted preliminary approval (the "Preliminary Approval").[8]  (Id. at ¶ 96.)  The parties agreed on which ordinances would apply according to Resolution 58-07.[9]

> 97.  The 2007 Preliminary Approval was governed by the Township's Subdivision and Land Development Ordinance ("SALDO") in effect at the time of RP Wynstone's original plan submission (the "2005 Ordinances") as well as three (3) additional ordinances subsequently enacted by the Township: Ordinance No. 05-06, adopted August 22, 2005 ("Ordinance 05-06"); Ordinance No. 06-02, adopted January 30, 2006 ("Ordinance 06-02"); and Ordinance No. 07-08, adopted October 8, 2007 ("Ordinance 07-08") (collectively, the "Additional Ordinances").[10]

(Id. at ¶ 97.)

The Township, which required compliance with the Additional Ordinances as a condition of approval, applied the Additional Ordinances for many years when reviewing plan revisions.

---

[7]   The description of the allegations regarding RP Wynstone essentially mirrors the subheadings in the Amended Complaint and summarizes the content of each section.  (See Compl. at ¶¶ 95–249.)

[8]   In and around 2011 and 2012, following the bankruptcy of a predecessor developer, RP Wynstone acquired its interest in the properties at issue.  (Id. at ¶ 110.)

[9]   Resolution No. 58-07 was later corrected from 06-05 to 05-06 so the "Additional Ordinances" are 05-06, 06-02, and 07-08.  (See id. at ¶ 97 n. 1.)

[10]   The 2007 Preliminary Approval also granted nineteen (19) waiver requests from the Townships' SALDO requirements.  (See id. at ¶ 103; Resolution No. 58-07, Ex. "B," at 16.)

According to the Amended Complaint, the Township later claimed that the Additional Ordinances did not apply.  (See id. at ¶¶ 100–01.)  The Amended Complaint goes on to allege:

> 104.  The preliminarily approved plan proposed to develop the site as a mixed-use development consisting of approximately 379,220 square feet of commercial/office space and 761 residential units (141 units as detached dwelling; 303 units as atrium house; 139 units as townhouses; and 178 units as multiplex dwellings).

> 105.  Under Pennsylvania Municipalities Planning Code ("MPC") §508(4), applications are protected from changes in ordinances that adversely impact the application.[11]

> ***

> 107.  Thus, the Approved Preliminary Plan was protected from subsequent changes or amendments in zoning, subdivision or other governing ordinance that adversely affects the right to develop in accordance with the terms of the 2007 Preliminary Approval, which expressly applied the 2005 Ordinances as modified by the Additional Ordinances.

(Id. at ¶¶ 104, 105, 107.)

### 2.    Revised Plan Submissions (Revision Nos. 1-7) and Reviews

Between 2013 and 2018, RP Wynstone submitted seven (7) revisions to their development plans according to agreements made during the Preliminary Approval process.  (See id. at ¶¶ 112–24.)  Meetings took place between engineers, RP Wynstone, and professional consultants, resulting in refinement and revisions of the sketch plan for the development.  (See id. at ¶ 114.)  "On or about March 9, 2016, the Township solicitor issued a letter confirming that the 2007 Preliminary Approval remained valid until April 22, 2020."  (Id. at ¶ 116.)  Each of the seven (7) revisions were reviewed by the Township planner, as well as by traffic and civil engineers.  (See id. at ¶

---

[11]    MPC §508(4) provides in relevant part that "when a preliminary application has been duly approved, the applicant shall be entitled to final approval in accordance with the terms of the approved preliminary application," and "no subsequent change or amendment in the zoning, subdivision or other governing ordinance or plan shall be applied to affect adversely the right of the applicant to commence and to complete any aspect of the approved development in accordance with the terms of such approval within five years from such approval." MPC §508(4) (i–ii).

117.)  On November 9, 2018, RP Wynstone submitted Revision No. 7, which consisted of more significant changes to the plans than the previous revisions, reducing the number of dwelling units, and replacing office and daycare uses.  (See id. at ¶ 122.)  The Township did not raise any compliance issues with Revision No. 7.  (See id. at ¶ 123.)

### 3. Township's Alleged Coordinated Actions to Obstruct Development and Curb Racial Diversity

Beginning in 2018, Defendants, allegedly for fear of attracting minorities to the Township, tried to strip RP Wynstone of the protection from changes in ordinances afforded by the 2007 Preliminary Approval.  (See id. at ¶ 125.)  According to the Amended Complaint, they did so by using "bait-and-switch maneuvers" in which Defendants would strategically amend ordinances to ensure that Plaintiffs could not comply with them and therefore could not proceed with their development plans.  (See id. at ¶ 130.)

### a. Sump Pump Ordinance

For example, "[s]ometime before June 12, 2018, the Township provided to the Montgomery County Planning Commission ("MCPC") a draft ordinance to amend, in part, the Storm Water Management Ordinance, adding regulations concerning the installation of new sump pump[s]."[12]  (Id. at ¶ 127.)  The change included the following:  "For all required computation, the applicant shall use the figure of 4,000 gallons per day per sump pump . . . "  (Id.)

On June 13, 2018, the Township Planning Commission, with MCPC's support for the draft ordinance, met and voted to recommend its adoption.  (Id. at ¶ 128.)  On July 23, 2018, Supervisor

---

[12]  The ordinance dictated how much water per day per sump pump (a device that removes water from the basement of a building to prevent flooding and water damage) a developer would need to accommodate when designing stormwater management facilities for the development.  (Doc. No. 48-9 at 8, Compl. at ¶ 32.)  Plaintiffs RP Wynstone, RPE, and Provident are challenging the Ordinance in the Montgomery County Court of Common Pleas.  The Sump Pump Ordinance was last amended on January 3, 2022.  (Compl. at ¶ 221.)

Snook moved to adopt a version of the ordinance that used the standard of 4,000 cubic feet of water instead of 4,000 gallons, characterizing the change as a correction of a typographical error. (Id. at ¶ 129.)  "In a classic bait-and-switch maneuver, the Township presented a 4,000-gallon version for comments, but approved a 4,000 cubic feet version, which is equivalent to 29,922.08 gallons per day per pump."[13]   (Id. at ¶ 130.)   Thereafter, "the Board simply approved the 'typographical correction' without any notice, review, or comment."  (Id. at ¶ 131.)  On October 4, 2018, despite the switch to the excessive 4,000 cubic feet standard, the Township adopted the regulations, and the language regarding the sump pump requirement was codified in Storm Water Management Ordinance § 23-401.28.A(2)(a) ("Sump Pump Ordinance").

Plaintiffs allege the Sump Pump Ordinance "discriminately impacts larger subdivision and land development because it essentially "prohibits basements, adversely impacting the marketability of the homes that Landowners intend to develop."  (Id. at ¶¶ 139–40.)  Plaintiffs further claim:

> 141.  At the time of the Township's enactment of the Sump Pump Ordinance, the Sump Pump Ordinance did not apply to the proposed development of the RP Wynstone Property, as the development was proceeding under the 2007 Preliminary Approval, which was constrained by the 2005 Ordinances as modified by the Additional Ordinances.
>
> 142.  That was about to change as the Township acted in bad faith to strip RP Wynstone of the protections afforded by the 2007 Preliminary Approval and subject RP Wynstone to the newly enacted Sump Pump Ordinance, knowing that the Sump Pump Ordinance would effectively render the development financially unfeasible.

(Id. at ¶¶ 141–42.)

**b.    Township Requires Withdrawal of Previously Submitted Plans**

Then, in another alleged "bait and switch," the Township applied an ordinance it had never raised before to strip RP Wynstone of the protection afforded by its prior approvals.  (Id. at ¶ 143.)

---

[13]  One cubic foot is equal to 7.48052 gallons.

In the spring of 2019, Manager Gwynn advised that going forward, applicants, including RP Wynstone, were required to submit a Subdivision and Land Development Ordinance ("SALDO") application with revised plans, consenting to withdrawal of previously submitted plans pursuant to MPC §22-301(4), an ordinance that was subsequently removed.  (Id. at ¶¶ 144, 151.)  When RP Wynstone challenged this requirement, which was not set forth in any of the previous seven revised plans:

> 147.  Manager Gwynn represented that even with the withdrawal of previously submitted plans, any revisions to the Approved Preliminary Plan "would still be protected by the ordinances as of the date of [RP Wynstone's] application (July 13, 2005) since the plan submitted would be a revised plan on [the Approved Preliminary Plan.]"
>
> 148.  The Approved Preliminary Plan, while submitted for approval on July 13, 2005, obtained preliminary approval in October 2007 subject to not only the ordinances in effect as of the date of the application, i.e., the 2005 Ordinances, but also the Additional Ordinances that were expressly referenced in the 2007 Preliminary Approval.

(Id. at ¶¶ 147–48; see April 25, 2019, email from Manager Gwynn, Compl., Ex. "K.")

In preparing Revision No. 8, RP Wynstone understood Manager Gwynn's email to mean that any revisions to the Approved Preliminary Plan would be subject to the ordinances upon which the Approved Preliminary Plan had been approved, namely, the 2005 Ordinances, as modified by the Additional Ordinances (as they had been for all prior revisions).  (See id. at ¶¶ 149–50.)

### c.    Township's Revocation of Protective Extension

Without the protection of the Preliminary Approval remaining in place since all prior plans had to be withdrawn, Plaintiffs' plans were now subject to the Sump Pump Ordinance, which restricted what they could build on the property, by essentially prohibiting basements in any new building.  (Id. at ¶ 140.)  To avoid losing the protection afforded by the Preliminary Approval, RP Wynstone asked for a one-year extension of the Preliminary Approval's April 22, 2020 expiration date.  (Id. ¶ at 152.)  Although the Township's Board of Supervisors voted on November 7, 2019

to grant a six-month extension, the Township then declared the extension void.  (Id. at ¶¶ 154, 159.)    During  the  extension,  the  Board—knowing  that  construction  on  RP  Wynstone's development had not begun—also "imposed an extra-statutory condition requiring RP Wynstone to  present  by  December  7,  2019,  a  construction  schedule  of  substantial  completion  of improvements by October 22, 2020."  (Id. at ¶¶ 155–56.)  In a letter dated December 9, 2019, Manager Gwynn, "without authority and without providing the opportunity for discussion or public comment, unilaterally revoked the extension."  (Id. at ¶ 161.)[14]

### d.    Township Refuses to Apply Additional Ordinances to Revision No. 8

On December 18, 2019, RP Wynstone submitted the eighth revision of its development plans, which were "prepared to comply with the 2005 Ordinances as modified by the Additional Ordinances."    (Id. at ¶ 164.)    The Township accepted Revision No. 8 as a revision to the Preliminarily Approved Plan, not as a new application, which protected RP Wynstone from any subsequent ordinances that could adversely affect their right to develop in accordance with the Preliminary Approval.  (Id. at ¶ 166.)  The Amended Complaint then alleges:

> 167. However, although the 2007 Preliminary Approval expressly applied the 2005 Ordinances as modified by the Additional Ordinances, the Township refused to apply the ordinances upon which the 2007 Preliminary Approval had been granted.
>
> 168.  Instead, the Township sought to apply only the 2005 Ordinances, and not the Additional Ordinances upon which the 2007 Preliminary Approval had been granted in the first place.
>
> ***
>
> 172.  Not surprisingly, with confusion as to which ordinances applied to Revision No. 8, MCPC noted that "[a]bove all, it is not clear which zoning ordinance

---

[14]    On January 7, 2020, the first of ten (10) lawsuits was filed by a Plaintiff in state court concerning the validity and enforcement of land use ordinances and the application review process for developers.  Suits filed by different Plaintiffs followed.

should apply to this development" and "caution[ed] the township against taking any action on this plan until clarification is reached regarding the applicable zoning and SALDO ordinances, as any review comments are speculative until that decision can be reached.

(Id. at ¶¶ 167, 168, 172.)

### e.      Township Refuses to Properly Review Revision No. 8

Rather than schedule meetings with the Township staff and professional consultants,

Manager Gwynn sent an email prohibiting counsel for Landowners from communicating with the

Township's professional consultants. (Id. at ¶¶ 176–77.) Plaintiffs further allege:

179.  Such communications are elsewhere routinely part of what the Pennsylvania appellate courts have described as the give-and-take essence of subdivision and land development applications.

(Id. at ¶ 179.) And as alleged in the Amended Complaint,

181.    Pennsylvania law requires [the]Township to afford RP Wynstone the reasonable opportunity to address comments of the professional consultants and to revise its plans accordingly to address any plan deficiencies.

(Id. at ¶ 181.) Thereafter,

182. Manager Gwynn, however, rejected the submittal of the 4 substitute plan drawings ["Alternative Plan Drawings" submitted by RP Wynstone] by characterizing the substitute plan drawings as a new SALDO application, and thus incomplete.

(Id. at ¶182.)

### f.      Township Improperly Enacts Ordinance 21-03

On February 22, 2021, Manager Gwynn recommended the adoption of two zoning

ordinances, one of which, Ordinance 21-03, would completely invalidate the Alternative Plan

Drawings submitted by RP Wynstone as part of Revision No. 8, by removing the "B-2 Atrium

house" and the "B-Townhouse" uses from one district and removing the "B-2 Atrium house" and

"B-2 Twins" uses from another district. (Id. at ¶ 187.) Plaintiffs claim that enacting this ordinance

was "contrary to the Township's Comprehensive Plan that designates [one of the districts] to "serve

as a walkable and dynamic cultural, social, and commercial center in New Hanover" and [the other

district] to "provide for mixed-use neighborhoods that serve as a complementary residential

transition between [it] and other zoning districts." (Id. at ¶ 189.) The Amended Complaint further

alleges that on April 7, 2021, the Township did enact Ordinance 21-03 without following

applicable procedural requirements:

> 190.  Procedurally, the Township failed to comply with the requirements set forth in MPC §609(b)(1) and §107, by failing to publish notice of a public hearing for two successive weeks, provide the full text of the proposed zoning ordinance, or provide a sufficient summary describing the Ordinance in reasonable detail.
>
> ***
>
> 192.  Although Ordinance 21-03 cannot apply to Revision No. 8 and the Alternative Plan Drawings, the Township was laying the groundwork to oppose the development knowing that the Township would deny Revision No. 8, which would force RP Wynstone to submit a new subdivision land development plan, thereby subjecting RP Wynstone to all ordinances in effect at the time of the new application, including Ordinance 21-03.
>
> ***
>
> 196.  On May 3, 2021, RP Wynstone challenged the Township's adoption of Ordinance 21-03 for lack of notice and the state court invalidated Ordinance 21-03 on September 20, 2021.

(Id. at ¶¶ 190, 192, 196; see September 20, 2021, Order, Compl., Ex. "L.")

### g.    Township Asserts RP Wynstone Requires Further Development Approvals

On October 9, 2021, Manager Gwynn issued a letter stating the clearing performed on the

RP Wynstone Property was in violation of the Township's current Soil Erosion, Sedimentation,

and Grading Control Ordinance (the "E&S Ordinance") and the Township's Storm Water

Management Ordinance (which the Sump Pump Ordinance amended), despite RP Wynstone

receiving the required permits. (See id. at ¶ 198.) The Amended Complaint alleges:

> 199.  The Township directed RP Wynstone to comply with the E&S Ordinance within five (5) calendar days or face potential enforcement by the Township.

200.  Yet, the Township engineer acknowledged that the site clearing performed was permitted under the procured permits, and upon later inspection of the RP Wynstone Property, advised that its concerns had been addressed.

201.  RP Wynstone made preparations to continue development by installing sediment basins.

202. However, shortly thereafter, Manager Gwynn issued a "Cease and Desist Notice" to RP Wynstone's attorney, asserting that further Township approvals were required to proceed, despite the [Pennsylvania Department of Environmental Protection] directing RP Wynstone to install such sediment basins.

(Id. at ¶¶ 199–202.)

### h.    Township Denies Revision No. 8

On November 19, 2021, RP Wynstone's eighth revised development plan was denied.  (Id. at ¶ 203; see Denial Letter, Compl. Ex. M.)  At that point, RP Wynstone hit a wall because this denial deprived RP Wynstone of its protection under the Preliminary Approval, requiring them to submit a new application, thereby subjecting them to more restrictive ordinances, including the Sump Pump Ordinance.[15]  (Id. at ¶ 212.)

### 4.    2021 New Application for RP Wynstone Property

On December 1, 2021, RP Wynstone submitted a new application to develop its property in the Township.  (Id. at ¶ 216.)

### a.    Township Amends and Supersedes Sump Pump Ordinance Allegedly to Evade Judicial Challenge

On January 3, 2022—in an alleged attempt to evade judicial review of the Sump Pump Ordinance—the Township amended the sump pump requirement from 4,000 cubic feet per day to 0.25 cubic feet per second, which equates to 21,600 cubic feet per day or 161,579 gallons per

---

[15]  RP Wynstone has appealed the Township's denial of Revision No. 8 (In re Appeal of RP Wynstone, Montgomery County Court of Common Pleas, Case No. 2021-24529), which remains pending.  (Compl. at ¶ 213.)

day.[16]  (See id. at ¶¶ 220–21; see also Ordinance 22-01, Compl., Ex. "N.")  In order to comply

with Ordinance 22-01, RP Wynstone would now have to design oversized stormwater management

systems that are several times larger than what is "reasonably necessary to accommodate the

stormwater flowing onto their properties."[17]  (Id. at ¶ 222.)

### b.  Township Disputes RP Wynstone's Ownership of Sewer Capacity

Because RP Wynstone was now engaged in litigation with the Township, the Township

began, without any basis, to dispute RP Wynstone's ownership of its Equivalent Dwelling Units

("EDUs" estimate the amount of wastewater generated by a unit).  (See id. at ¶ 234.)  On one hand,

Manager Gwynn disputed RP Wynstone's ownership of the EDUs; on the other hand, he confirmed

such ownership by suggesting that RP Wynstone transfer its EDUs to the Township for no financial

consideration.[18]  (See id. at ¶ 235.)  The Amended Complaint alleges:

> 236. On June 8, 2022, Manager Gwynn suggested that any litigation surrounding
> ownership [of the EDUs] could be resolved if RP Wynstone's proposed housing
> density was reduced by 50% and RP Wynstone returned the amount of sewer
> capacity EDUs no longer required pursuant to this reduction.

(Id. at ¶ 236.)

### c.  Revision to 2021 New Application of RP Wynstone

On August 22, 2023, RP Wynstone submitted a revised set of plans, for which Defendant

Knight Engineering issued a review on October 3, 2023.  (See id. at ¶¶ 241–42.)  Because RP

Wynstone had to comply with the superseded Sump Pump Ordinance, it "will need to redesign the

---

[16]  One cubic foot per second is equal to 86,400 cubic feet per day.

[17]  On January 26, 2022, the Landowners had filed an action to challenge the Amended Sump
Pump Ordinance, RP Wynstone, LP, et al. v. New Hanover Township, Montgomery County
Court of Common Pleas, Case No. 2022-01135.  (See id. at ¶ 226.)

[18]  The value of the EDUs (sewer capacity) that Manager Gwynn suggested RP Wynstone did not
own and should therefore "return to the Township" was approximately $2,000,000.  (Id. at ¶
237.)

proposed development to remove basements, which will decrease marketability of any proposed development." (Id. at ¶ 246.)

At this point in the Amended Complaint, the factual allegations regarding RP Wynstone essentially end and the claims regarding Plaintiff Real Pro Enterprises ("RPE") begin.

## B. RPE Plaintiff Alleges It Was Treated Unfairly

Similarly to RP Wynstone Plaintiffs, RPE Plaintiff claims Township officials "hindered and obstructed" their development efforts. On April 26, 2021, RPE's developer submitted a new preliminary subdivision and land development application for the RPE Property, which was similar to a plan approved in 2015. (Id. at ¶¶ 253, 275.) As alleged in the Amended Complaint, RPE Plaintiff claims "inequitable treatment" by the Township for failing to give their application a thorough and proper review:

- first, improperly refusing to extend a routine extension on the final approval of a development plan granted in 2015 based on the plan's noncompliance with [the Sump Pump Ordinance];

  o Although, pursuant to MPC §508(4), the Sump Pump Ordinance would not apply to the development plan approved by the 2015 Final Approval, Supervisor Snook stated that the "sump pump ordinance will affect the plan," and the motion to extend was defeated.

  o The only material change in the Township's ordinances relating to land development between the date of the 2015 Final Approval and the denial of the extension request was the pending adoption of the Sump Pump Ordinance, which was the principal basis for denying the extension request.

- then, enacting the excessive Sump Pump Ordinance, without notice or review, effectively prohibiting basements, which the proposed townhouses on the RPE Property included;

- then, after RPE filed a complaint asserting a statutory challenge to the Sump Pump Ordinance, with the newly placed roadblock to development at risk of invalidation, the Township adopted yet another roadblock, namely Ordinance 21-01, deleting a permitted use in the R-15 residential zoning district, where the RPE Property sat at the time;

- then, after RPE filed a notice of appeal challenging the validity of Ordinance 21-01 and submitted a new application assuming Ordinance 21-01 would be invalidated, the Township attempted to cure the procedural defect of Ordinance 21-01 by enacting Ordinance 21-04, which purports to accomplish the same thing as Ordinance 21-01;[19]

- then, in order to make the development subject to the newly enacted, again procedurally defective, Ordinance 21-04, despite pending actions challenging the Sump Pump Ordinance and Ordinance 21-01, the Township ignored RPE's written time extension waiver and denied RPE's new application based on RPE's noncompliance with Ordinance 21-01.

(Id. at ¶¶ 254, 260, 261.)  The Amended Complaint further alleges:

280.   On April 27, 2021, the day after submission of the RPE Preliminary Application, Manager Gwynn emailed a representative of RPE, notifying him of the Township's intent to decide on the RPE Preliminary Application on July 1, 2021, 64 days after submission, despite the 90-day review period provided under 53 P.S. § 10508 and the duty of good faith and fair dealing between the Township and RPE inherent in the subdivision and land development review process, because RPE did not submit an unlimited time extension waiver.

281.   After receiving the Township's professional consultants' review letters, which were significant in length, on June 4, 2021, RPE provided written waiver of the ninety (90) day requirement for a decision on the RPE Preliminary Application.

282.   Five days later, at its public meeting on June 9, 2021, notwithstanding RPE's written time extension waiver, the Township Planning Commission not only discussed the RPE Preliminary Application, but decided to recommend denial of the RPE Preliminary Application, in part, because B-2 Performance Standards are not a permitted use in the R-15 residential zoning district.[20]
***

---

[19]   Ordinance 21-01, adopted February 22, 2021, amended the uses permitted in the R-15 and R-25 zoning districts, specifically to delete "B2 Performance Standard Development."  (Doc. No. 49-1, Ex. 6.)

[20]   Under the Township's Zoning Ordinance, the B-2 Performance Standard Development is defined as: "A development or subdivision that permits a variety of housing types subject to a series of performance standards. The performance standard development requires the provision of open space and limits density and impervious surfaces."  (Doc. No. 30-1 at 15) (citing New Hanover Township Zoning Ordinance § 27-305(2)(B).)

286. On July 13, 2021, Township Solicitor issued the written decision denying the RPE Preliminary Application [due in part to noncompliance with Ordinance 21-01].

(Id. at ¶¶ 280–82, 286, 288; see Email dated June 4, 2021, Compl. Ex. "R.")

The Amended Complaint claims that the Township Solicitor knew that Ordinance 21-01 was being challenged in court and, under MPC § 915.1(a), the Township was not permitted to render a decision on the RPE Preliminary Application during the pending litigation. (Id. at ¶ 289.)[21]

The Amended Complaint next turns to the Provident Plaintiffs' allegations.

## C. Provident Plaintiffs Allege They Received Unfair Treatment

Regarding the allegations in the Amended Complaint on Provident Plaintiffs' treatment by the Township, the Court's prior Opinion (Doc. No. 53) provides the following summary:

> According to the Complaint, while all of the back and forth was happening with RP Wynstone, Provident Plaintiffs' development plans were also thwarted by Defendants' "bait-and-switch" tactics concerning which ordinances would apply to their development plans. This mainly concerned the applicability of the Sump Pump Ordinance:
>
>> On or about June 5, 2020, Provident entered into an agreement with a residential homebuilder to subdivide and develop the parcel of the property at issue that is owned by Provident with single-family residential dwelling units that included basements. Because of the excessive requirements of the Sump Pump Ordinance, the residential homebuilder determined that it was not economically feasible to develop the property at the price per lot and terminated the agreement on January 19, 2021. If not for the excessive and unreasonable Sump Pump Ordinance, Provident would be able to develop the Provident Property with basements.

(Doc. No. 53 at 11, citing Compl. at ¶¶ 300–02.)

---

[21] On November 1, 2021, the state court declared Ordinance 21-01 invalid and void. (Compl. at ¶ 292; see November 1, 2021, Order, Compl, Ex. "S.")

### D. Plaintiffs Contend Defendants' Actions Were
   Motivated by Racial Animus

Plaintiffs assert that Defendants thwarted their development plans because their goal was to keep minorities from living in the Township. (See Compl. at ¶ 5.) In this regard, Plaintiffs contend that the Township's "recent troubled history with race, resulting in scandalous news stories, internal investigations, and a review by the Pennsylvania Attorney General" contributed to the racial animus that allegedly motivated Defendants' conduct. (Id. at ¶ 40.) Plaintiffs assert that Defendant Sgt. William Moyer set the tone for a racist environment in the police department and later in the racist tone of the Planning Commission. In doing so, Plaintiffs allege the following in the Amended Complaint:

42. By 2019, it was reported that Sgt. Moyer . . . repeatedly used racial slurs while on the job to disparage non-white residents and others.

43. Stories reported that Sgt. Moyer repeatedly used the "n-word," while out in public or in his police uniform, and there was even a "burn book" at the Police Department . . . that recorded many of the inappropriate and racial slurs used by Sgt. Moyer.

44. In one incident, Sgt. Moyer described an incident after executing a warrant in a lower-income part of the Township.

45. Sgt. Moyer referred to black suspects involved as "porch monkeys."

46. Then Township police chief Kevin McKeon also reportedly used the n-word to describe the backs of the clutch pins that hold officers' collar brass in place, because "they always hang around but never work."

* * *

49. A [Township] police officer, who was married to an Asian-American, reported hearing racist statements over the years from people on the job about his Asian-American wife and children.

50. Following early retirement due to a work-related injury, the police officer went to the Township police station to pick up his belonging, which had been placed in three boxes and piled up outside the station.

51. Sitting atop the stack of boxes, was an egg roll.

52. The "egg roll" incident was not an isolated work of a singular person, as one of the boxes was too heavy for one person to carry, but indicative of a culture fostered and nurtured by Sgt. Moyer and the Township police chief.

53. Sgt. Moyer called the police officer's physician, who was of Asian descent, a "witch doctor."

***

57. The Township never released the results of its internal investigation into the racist comments and Sgt. Moyer retired from the police department without adverse action.

58. Instead of cleaning up its act, the Township rewarded one of the individuals involved, Sgt. Moyer, by appointing him to the Township's Planning Commission.

59. The Township Planning Commission plays a critical advisory role in the land development process, as it is the primary body which reviews pending applications and makes recommendations for their approval or denial.

60. Notably, on January 3, 2022, after Sgt. Moyer retired from the police force, Supervisor Snook moved to appoint former Sgt. Moyer to the Planning Commission, where Sgt. Moyer could continue to exert his influence with authority.

61. In appointing Sgt. Moyer to the Planning Commission, the Township effectively endorsed his racist comments.

62. Sgt. Moyer, and other Board Supervisors or Planning Commission members, repeatedly made coded statements (also known as "dog whistles") to signal the desire to keep the minority population in the Township from growing.

63. For instance, Sgt. Moyer and others expressed their opinion that apartments or other forms of multi-unit housing, which would likely increase the racial diversity of the Township, was not appropriate for the town.

64. In one unguarded moment, Sgt. Moyer even expressed that the more affordable housing options would attract "those kinds of people" to the Township.

(Id. at ¶¶ 42–64.)

Plaintiffs refer to the Township's Comprehensive Plan 2040, which states that the Township "seeks to place higher density and multifamily housing to be located in areas where it is more practical, such as Pottstown, to enable more rural townships like New Hanover to maintain their

community character" . . . which is 95% white . . . and comprised primarily of single-family detached dwelling units." (Id. at ¶¶ 71–74.)  Plaintiffs allege that "Pottstown, the 'more practical' [according to the Township's Comprehensive Plan 2040] place for additional population growth, is about 63% percent white." (Id. at ¶ 73.)

### E. Amended Complaint Alleges Cedarville and Knight Defendants Were Complicit in Township Defendants' Scheme to Thwart Plaintiffs' Development

As noted above, in carrying out their alleged conspiracy to violate Plaintiffs' constitutional rights, Plaintiffs aver that Defendants distorted the ordinary review process, changed how ordinances were interpreted, and prevented Plaintiffs from getting clear guidance from the engineers whom it retained. (Id. at ¶¶ 308, 310.)  In this way, according to the Amended Complaint, Knight Defendants and Cedarville Defendants "played a pivotal role in [Township Defendants'] scheme . . . to stop all development." (Id. at ¶¶ 309–10.)  Because Knight and Cedarville Defendants are experienced municipal engineers, Plaintiffs assert that they were "aware that the Township was not reviewing these proposals in good faith or in keeping with any typical review process." (Id. at ¶¶ 311–12.)  Plaintiffs allege that the engineers were aware of the intent to stop development by any means necessary and actively participated in that effort.  Plaintiffs assert on information and belief that (1) the engineers aided and abetted the unlawful targeting of Plaintiffs, (2) Defendant Cedarville quit serving as the municipal engineer in part because of the pressure from Defendants to participate in this unlawful scheme, and (3) Defendant Knight, through its employee municipal engineer Daniel Gray, continues to participate in its role as the municipal engineer. (Id. at ¶¶ 314–17.)

### F. Plaintiffs Allege Defendants' Conduct Caused Their Damages

As a result of Defendants' conduct, RP Wynstone Plaintiffs claim that they:

- have been unable to develop the RP Wynstone Property;

- will need to redesign the proposed development to remove basements, which will decrease marketability of any proposed development;

- will need to incur additional cost to redesign and revise the development plan, which, even if approved by the Township, will result in delay of the development of the RP Wynstone Property. These delays are especially harmful because of changes in economic and market conditions, which will increase cost of development; and

- incurred attorneys' fees and costs associated with the numerous civil actions

(Id. at ¶¶ 245–49.)

Because of Defendants' treatment of RPE Plaintiff, RPE Plaintiff claims that it:

- have been unable to develop the RPE Property;

- will need to redesign the development to remove basements, which will decrease marketability of any proposed development;

- will need to incur additional cost to redesign and resubmit a new application for development of the RPE, which, even if approved by the Township, will result in delay of the development of the RPE Property. These delays are especially harmful because of changes in economic and market conditions, which will increase cost of development; and

- have incurred attorneys' fees and costs associated with the numerous civil actions

(Id. at ¶¶ 294–98.)

Because of Defendants' inequitable treatment of Provident Plaintiffs, Provident Plaintiffs claim that they:

- have been unable to develop the Provident Property;

- will need to redesign the development to remove basements, which will decrease marketability of any proposed development;

- will need to incur additional cost to redesign and resubmit a new application for development of the Provident Property, which, even if approved by the Township, will result in delay of the development of the Provident Property. These delays are especially harmful because of changes in economic and market conditions, which will increase cost of development;

29

- have incurred attorneys' fees and costs associated with the numerous civil actions.

(Id. at ¶¶ 303–07.)

## IV.    PROCEDURAL HISTORY

As summarized in this Court's prior Opinion (Doc. No. 53):

On March 5, 2024, Plaintiffs filed a Complaint, alleging (1) a violation of the Substantive Due Process Clause to the Fourteenth Amendment under 42 U.S.C. §1983, (2) a violation of the Equal Protection Clause to the Fourteenth Amendment under 42 U.S.C. § 1983, and (3) Civil Conspiracy (Doc. No. 1.). On May 1, 2024, Township Defendants filed a Motion to Dismiss the Complaint (Doc. No. 30). On May 7, 2024, both Cedarville Defendants and Knight Defendants filed Motions to Dismiss the Complaint (Doc. Nos. 34, 35). Plaintiffs responded with an Omnibus Response in Opposition to all three Motions (Doc. No. 42). At a hearing held with the parties on October 25, 2024, Plaintiffs were granted leave to file an Amended Complaint in order to clarify the numerous parties involved in the case. On November 1, 2024 Plaintiffs filed the Amended Complaint, which is now the operative Complaint in this case (Doc. No. 50).[22]

(Doc. No. 53 at 12–13.)[23]

## V.    STANDARD OF REVIEW

### A.  Standard on a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure (12)(b)(6)

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure

to state a claim upon which relief can be granted is set forth in Ashcroft v. Iqbal, 556 U.S. 662

---

[22]  On November 8, 2024, Rufus A. Jennings, Esquire, filed a letter on behalf of Township Defendants and Cedarville Defendants opting to stand on their original Motion to Dismiss because the Amended Complaint does not raise any new issues that have not already been briefed. (Doc. No. 51.) On November 11, 2024, Anthony Capasso, Esquire, filed a letter stating that Knight Defendants agree with the other Defendants. (Doc. No. 52.)

[23]  On December 23, 2024, this Court issued an Opinion and Order (Doc. Nos. 53, 54) denying Township Defendant's Motion to Stay this case pending the outcome of the ten (10) related cases currently pending in state court because despite factual overlap, essentially the same parties are not litigating essentially the same issues in this case as they are litigating in the state cases. Further, this Court concluded, among other things, that it need not stay the case in the interests of comity, judicial efficiency, or potential prejudice to the party opposing the stay.

(2009).  After Iqbal, it is clear that "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to

dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive

dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face.'"  Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir.

2018) (quoting Iqbal, 556 U.S. at 678).  Facial plausibility is "more than a sheer possibility that a

defendant has acted unlawfully."  Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678).

Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

(quotation marks omitted) (quoting Iqbal, 556 U.S. at 678).  In assessing the plausibility of a claim,

the court must "accept all factual allegations as true, construe the complaint in the light most

favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint,

the plaintiff may be entitled to relief."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir.

2009).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in

Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that

a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive

a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a
> claim."  Second, the court should identify allegations that, "because they are no
> more than conclusions, are not entitled to the assumption of truth."  Finally, "where
> there are well-pleaded factual allegations, a court should assume their veracity and
> then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679).  The inquiry is normally

broken into three parts:  "(1) identifying the elements of the claim, (2) reviewing the complaint to

strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234–35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

### B.  Standard on a Motion to Dismiss for Lack of Standing Under Federal Rule of Procedure 12(b)(1)

A motion to dismiss for lack of standing is brought under Federal Rule of Civil Procedure 12(b)(1) because standing is a jurisdictional matter. Const. Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014) (internal citation omitted). A district court considering a motion pursuant to Rule 12(b)(1) must first determine whether that motion presents a "facial" attack or a "factual" attack on the claim at issue "because that distinction determines how the pleading must be reviewed." Id. A facial challenge contests the sufficiency of the complaint because of a defect on its face, such as lack of diversity among the parties or the absence of a federal question. See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). In a facial challenge, the court must consider the allegations of the complaint as true and consider only those allegations in the complaint and the attached documents in deciding whether the plaintiff has sufficiently alleged a basis for subject-matter jurisdiction. See Gould Elecs. Inc. v. United States, 220 F.3d

169, 176 (3d Cir. 2000); see also U.S. ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007) (terming a facial attack as "an alleged pleading deficiency").  Thus, a court applies the same standard of review used in considering a motion to dismiss under Rule 12(b)(6).

A factual attack, on the other hand, challenges the actual failure of the plaintiff's claims to "comport with the jurisdictional prerequisites."  Pa. Shipbuilding, 473 F.3d at 514.  Such an evaluation may occur at any stage of the proceeding, but only after the defendant has filed an answer.  Mortensen, 549 F.2d at 891-92.  When a court is confronted with a factual attack, "[it] is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and the plaintiff bears the burden of showing that jurisdiction does in fact exist.  Id.  A district court may consider evidence outside the pleadings.  Gould Elecs. Inc., 220 F.3d at 176 (internal citation omitted).  No presumption of truthfulness attaches to the plaintiff's allegations, such that the existence of disputed material facts does not preclude a court from evaluating the merits of jurisdictional claims.  Mortensen, 549 F.2d at 891.

## VI.    ANALYSIS

### A.    Plaintiffs Have Failed to Allege a Violation of Equal Protection Under the Fourteenth Amendment to the United States Constitution

Plaintiffs claim in Count II of the Amended Complaint that Defendants violated their rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution through selective treatment.[24]  The elements of an Equal Protection violation based on selective treatment are the following:  (1) that Plaintiffs were treated differently from other similarly situated individuals, and (2) "that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, . . . or to prevent the exercise of a fundamental

---

[24]   Plaintiffs claim as an alternative that they have an Equal Protection Claim under a "class of one" theory, which is explained in detail below.

right."  Dique v. N.J. State Police, 603 F.3d 181, 184 (3d Cir. 2010) (quoting Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005)) (internal quotation marks and citation omitted).

Because Plaintiffs fail to satisfy these elements with the allegations in the Amended Complaint, and because Plaintiffs lack standing to assert an Equal Protection claim based on racial animus, the Equal Protection claim alleged in Count II fails and will be dismissed.

### 1.    Plaintiffs Were Not Singled Out Because Defendants Denied All Development in the Township

Regarding the first element of an Equal Protection violation, Plaintiffs fail to allege sufficient facts to establish they were singled out for selective discriminatory treatment, or treated differently from other similarly situated entities, for two reasons:  (1) Defendants thwarted all development in the Township, not just development by Plaintiffs, and (2) they do not link the allegations of racist behavior by Sgt. Moyer to the conduct of Defendants that gave rise to the claims in this case.  (Doc. No. 30-1 at 31–39.)

### a.    RP Wynstone Plaintiffs Have Not Shown They Were Treated Differently From Other Developers

Even if Defendants engaged in the kind of conduct that RP Wynstone Plaintiffs allege, when reviewing the allegations in the Amended Complaint in the light most favorable to the RP Wynstone Plaintiffs, they have not shown that the RP Wynstone Plaintiffs were treated differently from similarly situated entities.  For this reason, the Equal Protection claims brought by the RP Wynstone Plaintiffs must fail.

"Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects." Startzell v. City of Phila., 533 F.3d 183, 203 (3rd Cir. 2008) (internal citations and quotation marks omitted).  Here, the RP Wynstone Plaintiffs are similarly situated to other landowners, such as RPE and Provident Plaintiffs, who sought approval from the Township for residential development.  Beyond describing their plight when submitting revised applications, the

Amended Complaint essentially alleges events surrounding the Sump Pump Ordinance and decisions about plan revisions. The actions alleged as improper would apply to all developers during the relevant time period the Township approved plans for the developers. As averred in the Amended Complaint:

> 85. Consistent with their apparent objective of restricting growth and increased diversity, the Township has effectively stopped all building and land development.
>
> 86. In the last several years, while the Township has approved minor subdivisions, the Township has not approved any major subdivision and land development plans.
>
> 87. In 2022, the only approved land development was for a storage tank for a public utility.

(Compl. at ¶¶ 85–87.)

"Minor subdivisions" are not described in the Amended Complaint. Developments with less density in housing may be large or small. And, in a contradictory allegation, the Amended Complaint alleges that the only development plans approved by the Township were for minor subdivisions or for a storage tank for a public utility. These allegations do not show that Plaintiffs were treated differently from similarly situated potential developers of any kind of residential development. Moreover, regarding decisions about the development plan revisions and application of the different ordinances to the RP Wynstone Plaintiffs, there are simply no specific allegations about dissimilar conduct toward similarly situated land developers. Thus, the first element of an Equal Protection claim has not been met.

### b. RPE Plaintiff Has Not Shown It Was Treated Differently From Other Developers

RPE Plaintiff's Equal Protection claim fails for the same reason set forth above. RPE Plaintiff asserts that its land use application was denied as a result of the Township enacting

Ordinances 21-01 and 21-04.[25]  (See Compl. at ¶ 254.)  But because those ordinances were applicable to all landowners within applicable zoning districts, they do not amount to RPE Plaintiff being singled out for discriminatory treatment.  (See Doc No. 30-1 at 44.)  Moreover, Defendants allege that "at the time that Ordinance 21-01 was enacted, RPE did not have any proposed plan pending before the Township."  (Id.)  Therefore, in accepting the allegations in the Amended Complaint as true, RPE Plaintiff has not plausibly shown that it was treated differently from other similar developers or landowners.

### c.    Provident Plaintiffs' Claim That the Sump Pump Ordinance Was Enacted to Discriminate Against Them Is Meritless

Provident Plaintiffs' Equal Protection claim based upon unfair treatment by the Township fails for the same reason that RP Wynstone and RPE Plaintiff's claim fails.  Provident Plaintiffs heavily stake their Equal Protection claim on the Sump Pump Ordinance, essentially alleging that it was enacted by the Township to discriminate against them.  (See Compl. at ¶¶ 301–03.)  However, the Sump Pump Ordinance, like all town ordinances, applies equally to all developers within the Township.  (Id. at 46.)  Therefore, no plausible claim is alleged that its enactment or its amendments resulted in the Provident Plaintiffs being treated differently from any other similarly situated land developer.  (Id.)

### 2.    Plaintiffs Do Not Link Allegations of Racism by Sgt. Moyer to Defendants' Actions at Issue in This Case

Defendants argue that the allegations in the Amended Complaint regarding racist comments by Sgt. William Moyer are irrelevant and are included only as a "red herring, designed to distract and misguide the Court."  (Id. at 36.)  According to Defendants, the allegations are not pertinent because Sgt. Moyer joined the Planning Commission in 2022, after the Township adopted

---

[25]  Ordinance 21-04 reaffirms Ordinance 21-01, eliminating the B2 Performance Standard Development in the R-15 and R-25 zoning districts.  (Doc. No. 49-1, Ex. 8.)

Comprehensive Plan 2040, and when he did join the Commission, he had "no authority to render any decision on Plaintiffs' land use applications and was not involved in any of the Planning Commission decisions about which Plaintiffs complain."[26]  (Id. at 33, 36.)

Viewing the facts in the light most favorable to Plaintiffs, although it is true that the recommendation by a member of the Planning Commission carries enough weight in the approval process to affect decisions that Township officials make regarding development applications, most important is the fact that Sgt. Moyer did not join the Planning Commission until 2022.  (Id. at ¶ 31.)  As described above, almost all of the events that gave rise to the allegations in this case occurred between July 2005 and January 2022, and by the latter date nine (9) of the ten (10) state court cases had already been filed by certain Plaintiffs.  The Township's treatment of RP Wynstone's eighth revised development plan, which RP Wynstone Plaintiffs contend was part of the Township's "bait and switch" tactics and was the straw that broke the camel's back, was denied on November 19, 2021, before Sgt. Moyer joined the Commission.[27]  (See id. at ¶ 212.)  Thus, the lengthy and graphic depiction of the allegations against Sgt. Moyer while he worked for the police department, even when accepted as true, are not relevant to the claims asserted here.  Moreover, comments made by an employee of a municipality, however offensive, cannot be attributable to a decision-making board of the municipality in the absence of evidence that their content influenced the Board.  Because Plaintiffs do not link his statements to the treatment of Plaintiffs by the

---

[26]   Defendants note that the Township's Comprehensive Plan 2040 was adopted in April 2021 and attach Resolution R-21-06 to their memorandum as Exhibit "E" as proof.  (Doc. No. 30-1 at 36.)

[27]   In the Amended Complaint, Plaintiffs repeatedly accuse Defendants of conduct such as "bait and switch" maneuvers and "unfair treatment and unequal enforcement of the Township's policies," but these are only conclusions, not factual statements.  (See Compl. at ¶¶ 3, 4, 9, 21, 23, 142, 210, 310.)

Township, even when viewing the statements favorable to Plaintiffs, they do not support Plaintiffs'

notion that Defendants' conduct was motivated by racial animus or support the Equal Protection

claim.[28]

### 3.    Township Officials' Conduct Passes the Rational-Basis Test

Because there is no plausible race-based claim, Plaintiffs' Equal Protection claim is subject

to a rational-basis test, meaning that as long as there was a rational basis for the Township officials'

conduct, it was constitutional.  (See Doc. No. 30-1 at 36.)  The rational basis test is described in

Price v. Cohen, 715 F.2d 87 (3d Cir. 1983) as follows:

> To establish a violation of the equal protection clause, a plaintiff must show that the allegedly offensive categorization invidiously discriminates against the disfavored group.  The level of deference shown to the state-created categories varies according to the group discriminated against and the right or interest infringed. Certain groupings, such as those based on race, are regarded as suspect. As a result, the state may employ racial classifications only if it has a compelling reason to do so. At the other end of the spectrum of judicial scrutiny, regulations that have differing impacts on various types of commercial entities, for example a city ordinance controlling advertising on delivery vehicles, violate the equal protection clause only if they are not rationally related to a legitimate state interest.

(Doc. No. 30-1 at 32 (quoting Cohen, 715 F.2d at 91–92) (emphasis added).)

Defendants argue that "[a]s a matter of law, regulation of zoning and land development is

presumed to be a legitimate state interest."  (Id. at 40.)  In support, Defendants rely on Pace

Resources, Inc. v. Shrewsbury Township:

> [T]he Township, pursuant to the police powers delegated to it by the State, may regulate the uses of property within its jurisdiction to promote the public good. The initial step in any taking analysis, accordingly, is whether the challenged governmental action advances a legitimate public interest. In this step, the governmental action is entitled to a presumption that it does advance the public interest.

---

[28]  The same reasoning applies to Plaintiffs' claim that the motivation of Defendants was to keep minorities out of the Township.  This conclusory statement is not plausibly supported by factual allegations.  Furthermore, alleging that minor subdivisions were approved, presumably with less dense housing, without specific examples, is too conclusory to reach the required level of plausibility.

(Doc No. 30-1 at 40 (quoting <u>Pace</u>, 808 F.2d 1023, 1030 (3d Cir. 1987)).)  In that case, the plaintiff "object[ed] to the rezoning ordinance because it will allegedly 'prevent change, keep other citizens out of the Township, . . . minimize Township services and expenditures, . . . keep taxes down,'" but the court found that these arguments did "not indicate that the rezoning ordinance was undertaken for a purpose other than benefiting the public interest." <u>Id.</u>  The Third Circuit affirmed the district court's dismissal of that case.

Here, Defendants note that the enactment of the Sump Pump Ordinance, a critical ordinance relied on by Plaintiffs to support their Equal Protection claim, is rationally related to a legitimate state interest based on the following reasoning:

> The Sump Pump Ordinance was enacted pursuant to the Pennsylvania Storm Water Act, 32 P.S. § 680.1, <u>et seq</u>. In the Act's statement of purpose, the General Assembly noted, "A comprehensive program of storm water management, including reasonable regulation of development and activities causing accelerated runoff, is fundamental to the public health, safety and welfare and the protection of the people of the Commonwealth, their resources and the environment." 32 P.S. § 680.2(b). Under 32 P.S. § 680.11(b), municipalities are <u>required</u> to "implement such ordinances and regulations, including zoning, subdivision and development, building code, and erosion and sedimentation ordinances, as are necessary to regulate development within the municipality in a manner consistent with the applicable watershed storm water plan and the provisions of this act." (emphasis added). Section 680.12 provides for penalties in the event that a municipality fails to adopt such a plan. The Commonwealth of Pennsylvania has identified the control of storm water as "fundamental to the public health, safety and welfare and the protection of the people of the Commonwealth, their resources and the environment." 32 P.S. § 680.2(b).

(Doc No. 30-1 at 46–47.)

Plaintiffs also have pointed to other ordinances they claim were enacted to discriminate against them.  (<u>See</u> Compl. at ¶ 77.)  But besides Plaintiffs being subject to these ordinances, which they did not deem necessary and did not want to be applied to them, Plaintiffs have not plausibly shown that the ordinances themselves did not advance the public interest or a legitimate state

interest. Thus, Defendants' actions are presumptively constitutional, and viewing the facts in the Amended Complaint in the light most favorable to Plaintiffs, they have not plausibly alleged that there was no rational relationship between Defendants' actions toward Plaintiffs and the public interest in controlling growth in the Township and maintaining a community's character. (Doc No. 30-1 at 40.)[29]

Moreover, precedent demonstrates that "a difference of opinion on [what] is in the best interest of the Township" is not sufficient to demonstrate irrationality." Pace Res., Inc. 808 F.2d at 1035. In other words, just because Plaintiffs disagree with Defendants' actions and question the motivation behind them is not enough to plausibly infer that the actions were not pursuant to a legitimate state interest.

### 4. Plaintiffs Do Not Have Standing To Support an Equal Protection Claim Based on Racial Animus

There is yet another reason to dismiss the Equal Protection claim based on allegations of racial animus committed by Defendants. Plaintiffs do not have standing to make this claim for two reasons. First, any harm resulting from racial animus as alleged in the Amended Complaint would not fall on Plaintiffs but instead on the Township's citizens. And second, any such harm has not yet occurred.

Standing is a concept originating in the United States Constitution. Under Article III, the power of the judiciary extends only to "cases" and "controversies." Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016). An element of the case-or-controversy requirement is that a plaintiff must establish, based on their complaint, that they have standing to bring the case. Kamal v. J. Crew

---

[29] The fact that a state court declared an ordinance (Ordinance 21-01) void does not inevitably lead to the conclusion that the adoption of the ordinance was not made in the best interest of the Township at the time that it was enacted. (See Compl. at ¶ 292; see November 1, 2021, Order, Compl., Ex. "S.") The Township still could have been acting pursuant to a legitimate state interest.

Grp., Inc., 918 F.3d 102, 110 (3d Cir. 2019).  To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021).  For a harm to be "particularized . . . it must affect the plaintiff in a personal and individual way."  Spokeo, 578 U.S. at 339.  For a harm to be "concrete," the "injury must be 'de facto'; that is, it must actually exist."  Id. at 340 (citing Black's Law Dictionary 479 (9th ed. 2009)).  Moreover, "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 563, (1992) (citation omitted).

One issue here is whether the claims alleged to be motivated by racial animus pass the particularity requirement—in other words, whether Plaintiffs were direct recipients of wrongdoing motivated by racial discrimination.  Here, Plaintiffs, as corporate landowners "with no racial identity," lack standing because Plaintiffs are "not personally aggrieved by any alleged race-based animus." (Doc. No. 30-1 at 19, 25.)  If anyone were aggrieved by Township conduct in trying to keep minorities out, it would be minority citizens, not landowners who are developers.  At a hearing held with the parties on October 25, 2024, Plaintiffs' counsel said, "We're not suing on behalf of minorities."  If that is the case, and Plaintiffs are suing on their own behalf as corporate developers, they were not directly harmed by the alleged racial animus.  They still had the opportunity to market their developments to the population at large.

In Warth v. Seldin, the plaintiffs, who included residents but also organizations such as a Home Builders Association, claimed the town's zoning ordinance effectively excluded low- and moderate-income residents.  See Warth, 422 U.S. 490, 493–96 (1975).  The plaintiffs further

claimed that this practice had the discriminatory effect of excluding minorities.  Id.  In finding that the plaintiffs did not have standing to assert claims against the defendants for violating plaintiffs' First, Ninth, and Fourteenth Amendment rights, and plaintiffs' civil rights under 42 U.S.C. §§ 1981, 1982, and 1983, the United States Supreme Court held:

> [A] plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention.

Id. at 493, 508.  This was not done by the plaintiffs in Warth.

Here, if Plaintiffs suffered harm caused by Defendants by not being able to develop their land, it was not harm from racial discrimination against them directly.  Although they allege direct economic harm, the racial animus alleged is directed against others.

### 5.    Plaintiffs' Argument That They Are a Class of One Fails

Plaintiffs also claim that even if they are not members of a recognized suspect class, they "may proceed pursuant to the 'class of one' equal protection theory announced by the United States Supreme Court" in Village of Willowbrook v. Olech, 528 U.S. 562 (2000).  (Doc. No. 42 at 27 (quoting M & M Stone Co. v. Pennsylvania, Dep't of Env't Prot., No. 07-CV-04784, 2008 WL 4467176 (E.D. Pa. Sept. 29, 2008).)  This theory permits even a single individual or entity, who is not a member of a protected class, to bring an Equal Protection claim if the person or entity is treated differently from others who are similarly situated, if the person or entity was treated in an "irrational and wholly arbitrary" way.  Vill. of Willowbrook, 528 U.S. at 565.

Plaintiffs assert that this theory applies to their Equal Protection claims because (1) Plaintiffs are landowners who seek approval of land development applications and are similarly situated to other landowners who also seek land development applications and (2) Plaintiffs bore the brunt of "selective treatment" by being singled out in an arbitrary and irrational way with regard to the validity and applicability of zoning ordinances.  (Doc. No. 42 at 28–31.)

Putting the racial allegations aside, Plaintiffs allege that Defendants singled them out because they wanted to build medium- to high-density housing, whereas developers who proposed housing with smaller density or no housing at all received better treatment from the Township. (See Compl. at ¶ 340.)

For example, the Amended Complaint alleges that Defendants' "intentional decision to target Plaintiffs is not being applied equally to similarly situated individuals." (Id. at ¶ 346.) But, as noted earlier, there are no examples of how Plaintiffs are being treated less favorably than other landowners with proposed developments who are similarly situated. The Amended Complaint only provides as follows without alleging specific plausible facts:

86. In the last several years, while the Township has approved minor subdivisions, the Township has not approved any major subdivision and land development plans.

87. In 2022, the only approved land development was for a storage tank for a public utility.

(Id. at ¶¶ 86, 87 (emphasis added).)

Assuming the Township has not approved any major residential development plans, the Amended Complaint supplies no support for the allegation that Plaintiffs were treated differently than other similarly situated landowners who wanted to develop land in the Township.

Moreover, the Amended Complaint states:

139. The Sump Pump Ordinance also discriminately impacts larger subdivision and land developments.

140. The Sump Pump Ordinance arbitrarily prohibits basements adversely impacting the marketability of the homes that Landowners intend to develop.

***

246. Because of Defendants' inequitable treatment of RP Wynstone, RP Wynstone will need to redesign the proposed development to remove basements, which will decrease marketability of any proposed development.

43

(Id. at ¶¶ 139, 140, 246 (emphasis added).)

But Plaintiffs do not plausibly allege how selling homes without basements affect their marketability.

Plaintiffs also reference the following as additional examples of how they were singled out by Defendants from other similarly situated developers:

> 270. Based on Manager Gwynn's recommendation, on February 22, 2021, without complying with procedural requirements, the Township enacted Ordinance 21-01, which removed the B-2 Performance Standard Development as a permitted use in R-15 and R-25 residential zoning districts. See Ordinance 21-01.

> 271. According to the Township Comprehensive Plan, R-15 Residential "is intended to provide for higher density residential development," which allows for "development of housing units with smaller lot sizes."

(Id. at ¶¶ 270–71.)

As noted above, the B-2 Performance Standard "permits a variety of housing types subject to a series of performance standards. The performance standard development requires the provision of open space and limits density and impervious surfaces." (Doc. No. 30-1 at 15 (citing New Hanover Township Zoning Ordinance § 27-305(2)(B)).) All developers were subject to its terms. It does not support a contention of irrational or arbitrary selective treatment of Plaintiffs. Thus, the class of one argument fails, and for all the above reasons, the Equal Protection violation alleged in Count II will be dismissed.

### B. Plaintiffs Do Not State a Claim for Deprivation of Substantive Due Process Under the Fourteenth Amendment

#### 1. Plaintiffs Fail to Plausibly Allege That Defendants' Actions Were Arbitrary or Irrational and Not Pursuant to a Legitimate State Interest

Count I in the Amended Complaint alleges a violation of Plaintiffs' Substantive Due Process rights. This claim fails for the same reasons the Equal Protection claim under the "class of one" theory fails: Plaintiffs do not plausibly allege in the Amended Complaint that Defendants'

actions were (1) arbitrary or irrational and (2) did not serve a legitimate state interest.  (See Doc. No. 30-1 at 48.)

A case from this District, which the Third Circuit affirmed, sets out the elements for such a claim:

> The Due Process Clause of the Fourteenth Amendment "contains a substantive component that bars arbitrary, wrongful government action 'regardless of the fairness of the procedures used to implement them.'" Zinermon v. Burch, 494 U.S. 113, 125, (1990) (quoting Daniels v. Williams, 474 U.S. 327, 331, (1986)); Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 399 (3d Cir. 2000). To establish a substantive due process claim under 42 U.S.C. § 1983, plaintiff must prove 1) the particular interest at issue is protected by the Fourteenth Amendment, and 2) the government's deprivation of that protected interest "shocks the conscience." Gottlieb v. Laurel Highlands Sch. Dist., 272 F.3d 168, 172 (3d Cir. 2001).[30]
>
> To meet this standard, [the plaintiff] must present evidence of state action that "'shocks the conscience,' which encompasses 'only the most egregious official conduct.'"  Chainey v. Street, 523 F.3d 200, 219 (3d Cir.2008) (quoting United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 400 (3d Cir.2003)).  "The conduct must be 'intended to injure in some way unjustifiable by any government interest.' " Newman v. Beard, 617 F.3d 775, 782 (3d Cir.2010) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 849, (1998)).
>
> The Third Circuit has held that three standards may support a finding that government action shocks the conscience: 1) deliberate indifference; 2) gross negligence or arbitrariness; or 3) intent to cause harm. Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir.2008) . . . The Supreme Court has directed that "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." Lewis, 523 U.S. at 850.

MFS, Inc. v. DiLazaro, 771 F. Supp. 2d 382, 438–39 (E.D. Pa. 2011), aff'd, 476 F. App'x 282 (3d Cir. 2012).

---

[30]  Defendants do not argue that Plaintiffs' property interests were not protected by the Due Process Clause.  They do argue that the second prong of the Substantive Due Process claim was not met.  (See Doc. No. 30-1 at 51.)

In other words, Plaintiffs would need to describe an arbitrary, wrongful action that deprived Plaintiffs of a constitutionally protected interest in a manner that shocks the conscience—via (1) deliberate indifference; (2) gross negligence or arbitrariness; or (3) intent to cause harm—and was not justified by a state interest.  And in scenarios such as this one, "where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient." Sanford v. Stiles, 456 F.3d 298, 309 (3d Cir. 2006).  The Third Circuit has defined deliberate indifference as requiring a "conscious disregard of a substantial risk of serious harm."  Vargas v. City of Phila., 783 F.3d 962, 973–74 (3d Cir. 2015) (quoting Ziccardi v. City of Phila., 288 F.3d 57, 66 (3d Cir. 2002)) (internal quotation marks omitted).

An example of "deliberate indifference" reaching the level of "shocking the conscience" is found in L.R. v. School District of Philadelphia, in which a parent brought a § 1983 action against school officials for violating a young student's Fourteenth Amendment rights.  836 F.3d 235, 246 (3d Cir. 2016).  There, the culpability standard for a Substantive Due Process claim was deliberate indifference because there was no evidence that the school officials had to make decisions in a hurry.  See id.  On appeal of a denial of a motion to dismiss the complaint, the Third Circuit held that:

> the risk of harm in releasing a five-year-old child to an unidentified, unverified adult is "so obvious" as to rise to the level of deliberate indifference. The fact that there was a school policy in place prohibiting the release of pre-kindergarten through eighth grade students to an adult without proper documentation tends to show that school officials were aware that releasing a young child to a stranger is inherently dangerous. What is more, whether or not that policy existed, the fact that [a teacher] asked [a stranger] for her identification illustrates that [the teacher] himself was indeed aware of the risk of harm in releasing [the child] to a stranger, even if he was unaware of [the stranger's] specific criminal intent. That he still allowed [the child] to leave despite [the stranger's] failure to produce identification or verification, we think, rises to conscience-shocking behavior.

Id.

Moreover, in Pace Resources, Inc. v. Shrewsbury Township., supra, a landowner who sought approval for a commercial development sued a township claiming its land use restrictions violated the Fifth Amendment and the Substantive Due Process Clause of the Fourteenth Amendment. Pace, 808 F.2d at 1025. The plaintiff had received preliminary approval for its development plan, but later claimed that its development plans were denied due to township rezoning. See id. In holding that the complaint did not adequately allege a substantive due process violation, the court cited a Fifth Circuit description of the standard that a district court should apply when scrutinizing zoning ordinances:

> [F]ederal judicial interference with a state zoning board's quasi-legislative decisions, like invalidation of legislation for "irrationality" or "arbitrariness," is proper only if the governmental body could have had no legitimate reason for its decision. See, e.g., Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456 (1981); Vance v. Bradley, 440 U.S. 93 (1979).

Id. at 1034–35 (citing Shelton v. City of College Station, 780 F.2d 475, 482–83 (5th Cir. 1986) (en banc), cert. denied, 477 U.S. 905 (1986) and 479 U.S. 822 (1986)) (emphasis added).

In Pace, the court noted that "[t]he test for determining whether a law comports with substantive due process is whether the law is rationally related to a legitimate state interest." See Id. at 1035 (quoting Rogin v. Bensalem Twp., 616 F.2d 680, 689 (3d Cir. 1980)) ("Unlike equal protection . . . the focus of due process analysis is not whether the Township has irrationally distinguished between similarly situated classes, but whether it was irrational for the Township to have passed the law at all and to have applied it to [the plaintiff].")

Further, the Pace court opined:

> The federal courts largely defer to legislative judgment on such matters as zoning regulation "because of the recognition that the process of democratic political decisionmaking often entails the accommodation of competing interests, and thus necessarily produces laws that burden some groups and not others." This court will not substitute its judgment about land use policy and thereby undermine the

legitimacy of democratic decisionmaking unless the local legislative judgment is without a plausible rational basis.

Id. (quoting Rogin, 616 F.2d at 687).

Here, the allegations in the Amended Complaint about the Township amending ordinances to the detriment of the developers and taking other action to allegedly impede their applications does not rise to the level of conscience-shocking conduct.  (See Compl. at ¶¶ 130, 143.)  The actions of Defendants were pursuant to legitimate state interests, land use and zoning.  Such conduct is not "arbitrary or irrational," and the allegations in the Amended Complaint, once again viewing them as true, do not support an argument to the contrary.  Dissatisfaction by land developers with ordinances or regulations being applied to them does not mean that the ordinances or regulations were "arbitrary or irrational" or demonstrate egregious conduct.

This case is more akin to Eichenlaub v. Township of Indiana, in which the plaintiffs claimed that:

> zoning officials applied subdivision requirements to their property that were not applied to other parcels; that they pursued unannounced and unnecessary inspection and enforcement actions; that they delayed certain permits and approvals [among other claims] . . .[T]hese complaints are examples of the kind of disagreement that is frequent in planning disputes.

Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 286 (3d Cir. 2004).

Thus, in viewing the facts in the Amended Complaint in the light most favorable to Plaintiffs, they have not plausibly alleged that Defendants engaged in conduct toward them that "shocks the conscience" or was not related to a legitimate state interest.  The allegations do not show that Defendants were deliberately indifferent.  Instead, they show that actions were taken, and ordinances implemented and applied, to further the interests of the Township.  Therefore, Plaintiffs fail to state a claim for deprivation of Substantive Due Process under the Fourteenth Amendment and this claim as alleged in Count I will be dismissed.

### C.    Plaintiffs Do Not Plead a Plausible Claim of Conspiracy

The third claim alleged in the Amended Complaint is for civil conspiracy.  Only two

paragraphs in the Amended Complaint discuss the conspiracy claim.  They are:

> 352.  To the extent that the Individual Defendants are not considered as state actors,
> they have conspired with one another to violate Plaintiffs' rights and privileges
> under the Fourteenth Amendment and to interfere with Plaintiffs' development of
> their properties as stated above.
>
> 353.  To the extent that the Individual Defendants are not considered as state actors,
> they have in fact carried out their conspiracy by violating Plaintiffs' rights and
> privileges under the Fourteenth Amendment and interfering with Plaintiffs'
> development of their properties as stated above.

(Compl. at ¶¶ 352, 353.)

Construing these two paragraphs in the light most favorable to Plaintiffs, they allege a

conspiracy to violate the Fourteenth Amendment.   Regarding the language in each paragraph that

Defendants "interfere[d] with Plaintiffs' development of their properties," this language appears

to have been inserted not as an additional state claim, but as language that shows the consequences

of the violation of their Fourteenth Amendment rights.  This is the only logical reading of the

paragraphs.  But, giving the paragraphs as expansive a reading as possible at the motion to dismiss

stage, the Court will analyze the paragraphs as alleging a civil conspiracy to violate both state and

federal rights.

Given this backdrop, whether Plaintiffs are claiming the existence of a civil conspiracy

pursuant to 42 U.S.C. § 1985 or under Pennsylvania law, they fail to state a plausible claim of civil

conspiracy.

If the alleged civil conspiracy falls under state tort law the following standard would apply:

"In Pennsylvania, 'to state a cause of action for civil conspiracy, the following elements are

required: (1) a combination of two or more persons acting with a common purpose to do an

unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act

done in pursuance of the common purpose; and (3) actual legal damage.'" <u>Gen. Refractories Co.</u> <u>v. Fireman's Fund Ins. Co.</u>, 337 F.3d 297, 313 (3d Cir. 2003) (quoting <u>Strickland v. Univ. of</u> <u>Scranton</u>, 700 A.2d 979, 987–88 (1997)) (citation and internal quotations marks omitted).

In contrast, federal law under 42 U.S.C. § 1985(3) provides in relevant part:

(3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire  . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

Thus, to sufficiently allege a violation of under 42 U.S.C. § 1985(3), the following elements must be met:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

<u>Farber v. City of Paterson</u>, 440 F.3d 131, 134 (3d Cir. 2006) (quoting <u>United Bhd. of Carpenters</u> <u>& Joiners v. Scott</u>, 463 U.S. 825, 828–29 (1983)).

Both civil conspiracy under Pennsylvania state law and under § 1985(3) require a combination of two or more persons to do an unlawful act.  For federal purposes, the unlawful act is depriving a person of equal protection of the laws or of equal privileges and immunities under

the law.  This element would undoubtedly cover the Equal Protection Clause of the Fourteenth Amendment and probably also the Substantive Due Process component.  But in this case, as discussed above, the plausible allegations in the Amended Complaint do not support a violation of either the Equal Protection Clause or the Substantive Due Process Clause.  Thus, there is no unlawful conduct alleged here.  Furthermore, the object of a civil conspiracy under Pennsylvania law is to do an unlawful act or a lawful act by unlawful means or for an unlawful purpose.  Here, too, Plaintiffs have failed to plausibly allege that Defendants committed an unlawful act or lawful act by unlawful means or for an unlawful purpose.  Consequently, the civil conspiracy claim in Count III will be dismissed.

### D. The Claims Are Barred by the Applicable Statute of Limitations

#### 1. Plaintiffs' Claims Are Time-Barred From the Face of the Amended Complaint

The statute of limitations that applies to the three claims in this case, violations of Substantive Due Process (Count I), Equal Protection (Count II), and civil conspiracy (Count III), is two years.  The federal claims in Counts I and II are brought under 28 U.S.C. § 1983.  The statute of limitations for 28 U.S.C. § 1983 claims is governed by the personal injury tort law of the state where the cause of action arose, which in Pennsylvania is two (2) years.  See 42 Pa. CONS. STAT. § 5524(2);  see also Kach v. Hose, 589 F.3d 626, 634 (3rd Cir. 2009).  The statute of limitations for civil conspiracy is two (2) years.  See Harry Miller Corp. v. Mancuso Chemicals Ltd., 469 F. Supp. 2d 303, 318 (E.D. Pa. 2007) ("The statute of limitations for civil conspiracy is identical to the statute of limitations for the underlying substantive offense.")

The Complaint in this case was filed on March 5, 2024.  Given that the statute of limitations is two years, events that support the three claims must have occurred after March 5, 2022.  And in deciding a statute of limitations challenge at the motion to dismiss stage, a court must determine

whether a violation of this limitations period is apparent on the face of the complaint.  <u>See</u> <u>Wisniewski v. Fisher</u>, 857 F.3d 152, 157 (3d Cir. 2017).  But the clock starts when the plaintiff knew or should have known of the injury upon which the actions are based.  <u>See</u> <u>id.</u>

### a. From the Face of the Amended Complaint, It Is Clear That the Statute of Limitations Has Run on All Claims Asserted by Provident Plaintiffs and RPE Plaintiff

#### i. Regarding Provident Plaintiffs

First, as noted above, all conduct that the Provident Plaintiffs complain of occurred between June 5, 2020 and January 26, 2022.  (<u>See</u> Compl. at ¶¶ 226, 300; Doc. No. 48-9 (citing <u>RP Wynstone, LP, Real Pro Enterprises, LP and Provident Trust Group, LLC v. New Hanover Township</u>, Case No. 2002-1135).)  Provident Plaintiffs knew of the injury they claim arose from the Sump Pump Ordinance, as evidenced by the lawsuit brought by Provident in state court on January 26, 2022.  (Doc. No. 48-9 (citing Case No. 2002-1135).)  But Provident Plaintiffs waited more than two (2) years before filing this claim on March 5, 2024.  (<u>See</u> Doc. No. 30-1 at 27.) Therefore, on the face of the Complaint, Provident Plaintiffs' claims against the Township Defendants were filed in violation of the statute of limitations and will be dismissed.

#### ii. Regarding RPE Plaintiff

Second, Defendants' conduct allegedly giving rise to REP's claims, as detailed above, took place between July 13, 2015 and December 2, 2021, more than two years before the filing of the Complaint and therefore outside the statute of limitations.  RPE Plaintiff knew of its alleged damages during the time period they interacted with the Township and failed to file this case within the two-year limitations period.  (<u>See</u> Compl. at ¶¶ 251, 256.)  In this regard, because the Amended Complaint does not assert that the Township Defendants took any action with regard to the McGree tract after December 2, 2021, REP Plaintiff's claims are also time-barred.

> **b.  From the Face of the Amended Complaint, It Is Clear That
> the Statute of Limitations Has Also Run on the Claims Asserted
> by RP Wynstone Plaintiffs**

Third, nearly all of Defendants' conduct about which RP Wynstone Plaintiffs complain, as discussed above, took place between July 13, 2005 and January 26, 2022 and is time-barred.  RP Wynstone Plaintiffs knew about the offending conduct since they filed many state lawsuits addressing the alleged ramifications of those acts.  (See id. at ¶¶ 95, 226; Doc. No. 30-1 at 31.) Consequently, given that the Complaint in this case was filed on March 5, 2024, RP Wynstone Plaintiffs claims will be dismissed for violation of the two-year statute of limitations.

> **2.    The Continuing Violation Doctrine, an Exception to the Timely Filing
> Requirement, Does Not Overcome the Statute of Limitations Violation**

One equitable exception to the timely filing requirement, otherwise known as the tolling of the statute of limitations, is provided by the Continuing Violation Doctrine.  If conduct that gives rise to a claim is ongoing, and acts occur within the limitations period, the statute of limitations period is tolled.  The doctrine is described in Brenner v. Local 514, United Brotherhood of Carpenters & Joiners of America:

> In most federal causes of action, when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred.

927 F.2d 1283, 1295 (3d Cir. 1991) (emphasis added).  However, the United States Supreme Court has held that this doctrine may not preserve time-barred claims for "discrete discriminatory acts." See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).

> **a.  The Two Discrete Acts That Fall Within the Statute of Limitations Are
> Not Within the Continuing Violation Doctrine**

The parties agree that there are only two acts relating to RP Wynstone that occurred within the two-year statute of limitations.  They are:

- 236.  On June 8, 2022, Manager Gwynn suggested any litigation surrounding ownership could be resolved if RP Wynstone's proposed housing density was reduced by 50% and if RP Wynstone returned the amount of sewer capacity EDUs no longer required pursuant to the reduction.

  ***

- 242. On October 3, 2023, the Township engineer, Knight Engineering, Inc., the latest in a revolving door of township professional consultants, issued its review of the August 2023 Revision No. 1.

(Compl. at ¶¶ 236, 242.)

### i.    The Offer to Settle the Case

The first act, alleged in paragraph 236 of the Amended Complaint, falls within the applicable statute of limitations.  However, it is a discrete act that would not be admissible at trial pursuant to Federal Rule of Evidence 408 because it was made during a discussion concerning the settlement of pending litigation.  (See Doc. 30-1 at 30 n. 125; Fed. R. Evid. 408.)  As noted by the court in Wolfe v. City of Sunbury,

> [C]ourts in this circuit have issued divergent rulings on this issue, with some courts holding that Rule 408 "is a rule of evidence and does not govern pleadings" and other courts holding . . . that some inadmissible settlement material must be stricken even at the dismissal stage.

No. 4:24-CV-00251, 2024 WL 4989323, at *6 (M.D. Pa. Dec. 5, 2024) (citing Steak Umm Co., LLC v. Steak 'Em Up, Inc., Civil Action No. 09-2857, 2009 WL 3540786, at *3(E.D. Pa. Oct. 29, 2009)).

This Court agrees that settlement material should not be considered at the motion to dismiss stage.  It would be inadmissible at trial and is not relevant to the merits of the ongoing litigation.  Moreover, the offer of settlement was a one-time occurrence rather than part of an ongoing pattern.  This act was also not discriminatory and not independently actionable; it was merely an attempt to settle the case.

ii.        **Knight Engineering's Review of RP Wynstone's Revised Plans**

The second act noted above that falls within the statute of limitations is also a discrete act. It was also a one-time occurrence. On October 3, 2023, Knight Engineering reviewed the plan submitted on August 22, 2023, and pursuant to their role, they gave their recommendation to Township officials.

The Amended Complaint alleges, after paragraph 242 quoted above, the following :

244. The Township engineer's use of the since superseded Sump Pump Ordinance is contrary to the Township's representation in its motion for summary judgment in the Sump Pump Ordinance Action that the Sump Pump Ordinance has been amended and superseded by the Amended Sump Pump Ordinance and that the Township cannot enforce the provisions of the Sump Pump Ordinance against RP Wynstone.

(Compl. at ¶ 244.)

Construing this allegation in the light most favorable to Plaintiffs, it does seem to claim that the amended Sump Pump Ordinance harmed Plaintiffs in their pursuit of their development plans. However, since the Amended Complaint does not support the notion that this specific act was discriminatory, but only that it prevented Plaintiffs and other similarly situated developers from completing their projects, the allegation is conclusory, speculative and not independently actionable. Further, the allegation above does not demonstrate that this one act was part of an ongoing pattern because it is the only example given of an alleged discriminatory act by Knight Engineering in the Amended Complaint.

Therefore, the continuing violation doctrine does not apply here because the two allegations that would have been part of the alleged ongoing pattern are discrete acts that did not

extend offending conduct to a point within the statute of limitations. Thus, the three claims also

must be dismissed because they were not filed in a timely fashion.[31]

### E. Because Plaintiffs Do Not Plausibly Allege Constitutional Violations, Qualified Immunity Applies in This Case

The United States Supreme Court has adopted a two-part test to determine if qualified

immunity applies:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

Pearson v. Callahan, 555 U.S. 223, 232 (2009).

### 1. Persons Who Have Been Sued in Their Individual Capacity Are Cloaked With Qualified Immunity[32]

The following Defendants are sued in their individual capacity: Township officials William

Ross Snook, Kurt Zebrowski, Marie Livelsberger, Boone Flint, and Charles Garner, Township

---

[31] If this conduct were not discrete acts but part of an ongoing conspiracy among Defendants to thwart Plaintiffs' plans for development, then the continuing violation doctrine would be applicable. The parties do not address the conspiracy claim with regard to the statute of limitations. But notably "where there are continuous and repetitious acts or trespasses as a part of a continuous conspiracy, it has been held that the statute of limitations does not begin to run until after the commission of the last act of the conspiracy." Baker v. Rangos, 324 A.2d 498, 510 (Pa. Super. Ct. 1974) (internal citation omitted). But since the allegations of conspiracy in this case are insufficiently alleged for the reasons noted supra, the point is moot. See, e.g., Suber v. Guinta, 902 F. Supp. 2d 591, 611 (E.D. Pa. 2012).

[32] The Amended Complaint refers to "Individual Defendants," as the following: Supervisors William Ross Snook, Kurt Zebrowski, Marie Livelsberger, Boone Flint, and Charles Garner, as well as Township Manager Jamie Gwynn, Authority Chair Miskiewicz, Planning Chair Oister, Planning Vice Chair Susan Smith, Sgt. William Moyer, Knight Engineer Daniel Gray, and Cedarville Engineer Robert Flinchbaugh. (Compl. at ¶ 36.) Because Gray and Flinchbaugh are not Township officials, the discussion on qualified immunity does not apply to them. Rather than using Plaintiff's grouping of Defendants, it is more helpful to break them down into which persons were sued in their individual versus official capacities.

Manager Jamie Gwynn, and Sewer Authority Chair Thomas Miskiewicz.[33]  (See Doc. No. 42 at

39.)  In Pearson, the Supreme Court held that the two prongs may be considered in any order.

Pearson, 555 U.S. at 236.  But here, when viewing the allegations in the Amended Complaint in

the light most favorable to Plaintiffs, no violation of a constitutional right has been plausibly pled,

which is the first element of qualified immunity.  Therefore, these individual Defendants are

entitled to qualified immunity.  Thus, there is no reason for this Court to proceed to the second

prong, and the Amended Complaint, as it applies to them, must be dismissed on this ground too.

## 2.  Persons Who Have Been Sued in Their Official Capacity

Defendants sued in their official capacity are Planning Chair Russel Oister, Planning Vice

Chair Susan Smith and Sgt. William Moyer, as representatives of the New Hanover Planning

Commission.  (See Compl. at ¶¶ 29–31; Doc. No. 42 at 39.)

The United States Supreme Court has held that a suit against a municipal official in his

official capacity is in fact a cause of action against the municipality itself.  See Brandon v. Holt,

469 U.S. 464, 464 (1985) ("In cases under § 1983, a judgment against a public servant 'in his

official capacity' imposes liability on the entity that he represents.")  By that reasoning, the

Planning Commission would be the appropriate party to sue here, not the individuals who serve

on it.

But this case is similar to Chapolini v. Capodanno, in which individual defendants were

sued in their official capacity and not the entity on which they served.  The court in Chapolini v.

Capodanno made the following observation:

> The defendants have not cited to any case where a court has dismissed official
> capacity claims against individual defendants where the government entity is not
> named as a defendant, simply because the claims are the types of claims that could

---

[33]  Plaintiffs clarified at the October 25, 2024 hearing that Defendants Russel Oister, Susan
Smith and William Moyer are the only Defendants sued in their official capacity.

> be asserted against the governmental entity.  Therefore, the defendants' argument
> does not warrant dismissal.

Chapolini v. Capodanno, No. CV 18-2629, 2019 WL 4242508, at *6 (E.D. Pa. Sept. 5, 2019.)
Thus, it appears here appropriate to have sued the named induvial defendants in their official
capacity.

But, in any event, the claims as they relate to these individual Defendants must be
dismissed because, as noted previously, when viewing the allegations in the Amended Complaint
in the light most favorable to Plaintiffs, they have not committed a violation of Plaintiffs'
constitutional rights nor conspired to do so.

## VII.    CONCLUSION

For all the foregoing reasons, Township Defendants' Motion to Dismiss the Complaint (Doc.
No. 30), and Cedarville and Knight Defendants' Motions to Dismiss the Complaint (Doc. Nos. 34,
35) will be granted.  An appropriate Order follows.